Franklin Rodriguez DELGADO,
et al., Plaintiffs,

v.

SHELL OIL CO., et al., Defendants.

Jorge Colindres CARCAMO,
et al., Plaintiffs,

v.

SHELL OIL CO., et al., Defendants.

Ramon Rodriguez RODRIGUEZ,
et al., Plaintiffs,

v.

SHELL OIL COMPANY,
et al., Defendants.

Manuel Antonio Balderamos
ERAZO, Plaintiff,

v.

SHELL OIL CO., et al., Defendants.

Juan Ramon VALDEZ, et al., Plaintiffs,

v.

SHELL OIL CO., et al., Defendants.

Isae CARCAMO, Plaintiff,

v.

SHELL OIL CO., et al., Defendants.

Civ. A. Nos. H–94–1337, H–94–1359,
H–94–3248, H–94–3451, H–95–
1356 and H–95–1407.

United States District Court,
S.D. Texas,
Houston Division.

July 11, 1995.

Fred Misko, Charles Siegel, Misko, Howie & Sweeney, Dallas, TX, Stephen D. Susman, James McCartt, Michael A. Lee, Susman Godfrey, Houston, TX, Harold W. Nix, Edward L. Hohn, Harold Nix & Associates, Daingerfield, TX, Wayne Fisher, Jim Huguenard, Fisher, Gallagher & Lewis, Houston, TX, John McEldowney, Greer, Herz & Adams, Galveston, TX, James W. Bradford, Jr., Angleton, TX, Joseph C. Kohn, Myles H. Malman, Martin J. D'Urso, Kohn, Nast & Graf, P.C., Philadelphia, PA, Thomas H. Hart, III, Alkon, Rhea & Hart, St. Croix, VI, Ramon Garcia, Dalinda G. Quintana, Law Office of Ramon Garcia, P.C., Edinburg, TX, Enrique Alvino Garza, Hebronville, TX, J.A. "Tony" Canales, Canales & Simonson, Corpus Christi, TX, Vaughn O. Stewart, Lake Jackson, TX, for plaintiffs.

John L. Hill, Jr., J. Michael Dorman, Richard Staff, James E. Essig, Liddell, Sapp, Zivley, Hill & Laboon, Burt Ballanfant, Shell Oil Co., Houston, TX, Morris Atlas, Lisa Powell, Atlas & Hall, L.L.P., McAllen, TX, Richard R. Gonzales, Hebronville, TX, Robert W. Weber, Atchley, Russell, Waldrop & Hlavinka, L.L.P., Texarkana, TX, John R. Gilbert, Gilbert, Gilbert & Boyd, P.C., Angleton, TX, for Shell Oil Co.

D. Ferguson McNeil, Vinson & Elkins, Charles W. Schwartz, Houston, TX, Stephen C. Lewis, Charles M. O'Connor, Mariah Baird, Landels, Ripley & Diamond, San Francisco, CA, Michael M. Phillips, Angleton, TX, T. John Ward, Calvin Capshaw, Brown, McCarrol & Oaks Hartline, Longview, TX, for Occidental Chemical Corp.

Terence M. Murphy, James S. Teater, Michael L. Rice, Jones, Day, Reavis & Pogue, Dallas, TX, Wiley Thomas, Angleton, TX, for Standard Fruit Co., Dole Fresh Fruit Co.

F. Walter Conrad, Michael Brem, Baker & Botts, L.L.P., Houston, TX, Patrick Reilly, Galveston, TX, J.G. Adami, Jr., Perkins, Oden, Warbuxton, McNeill, Adami & Paisley, Alice, TX, John R. Gilbert, Gilbert, Gilbert & Boyd, P.C., Angleton, TX, Eduardo R. Rodriguez, Rodriguez, Colvin & Chaney, Brownsville, TX, Robert Rolston, Bird Old III, Old, Rolston & Old, Mount Pleasant, TX, T. John Ward, Calvin Capshaw, Brown, McCarrol & Oaks Hartline, Longview, TX, for Dow Chemical Co.

Samuel E. Stubbs, William D. Wood, Fulbright & Jaworski L.L.P., Houston, TX, for Chiquita Brands and Chiquita Brands Intern., Inc.

James J. Juneau, Pamela K. Estes, Strasburger & Price, L.L.P., Houston, TX, Robert T. Greig, Howard S. Zelbo, Cleary, Gottlieb, Steen & Hamilton, New York City, for Del Monte Fresh Produce, N.A. and Del Monte Tropical Fruit Co.

Edward F. Fernandes, Solar & Fernandes, L.L.P., Houston, TX, for Programa Nacional de Banano.

Scott M. Hendler, The Hendler Law Firm, Austin, TX, Don Weitinger, Carrie Weitinger, Weitinger & Weitinger, Houston, TX, Michael Brickman, Ness, Motley, Loadholt, Richardson & Poole, P.A., Charleston, SC, for intervenors.

Jeffrey H. Marsh, Mattingly & Marsh, Houston, TX, Robert Crow, Boornazian, Jensen & Garthe, Oakland, CA, for Amvac Chemical Corp.

Laurence E. Best, Best, Koeppel & Klotz, Houston, TX, Laurence E. Best, Best, Koeppel & Klotz, New Orleans, LA, for intervenors (Hondurans).

Thomas J. Brandt, Bradley W. Cole, Robert A. Shults, Sheinfeld, Maley & Kay, P.C., Houston, TX, Peter R. Paden, Teitelbaum, Hillde, Rodman, Paden & Hibsher, P.C., New York City, for third- and fourth-party defendants, Dead Sea Bromine Co., Ltd., Bromine Compounds, Ltd., and Ameribrom, Inc.

## MEMORANDUM AND ORDER

LAKE, District Judge.

### TABLE OF CONTENTS

| | | Page |
|---|---|---|
| I. | Introduction | 1335 |
| II. | Parties, Posture, and Pending Pleadings | 1336 |
| | A. All Roads Lead to Houston | 1336 |
| | 1. Delgado v. Shell Oil Co., No. H–94–1337 | 1336 |
| | 2. Jorge Carcamo v. Shell Oil Co., No. H–94–1359 | 1337 |
| | 3. Rodriguez v. Shell Oil Co., H–94–3248 | 1338 |
| | 4. Erazo v. Shell Oil Co., H–94–3451 | 1338 |
| | 5. Valdez v. Shell Oil Co., H–95–1356 & | |
| | Isae Carcamo v. Shell Oil Co., H–95–1407 | 1339 |
| | B. Common Contentions and Uncommon Questions | 1340 |
| | 1. Issues concerning the propriety of removal | 1340 |
| | 2. Issues concerning dismissal of parties and actions | 1341 |
| III. | Removal and Remand | 1341 |
| | A. Standard of Review | 1341 |
| | B. Removal by Dead Sea | 1342 |
| | 1. Fraudulent joinder | 1342 |
| | 2. Prematurity | 1343 |
| | a. What law governs? | 1343 |
| | b. When does a defendant's right to remove mature? | 1343 |
| | c. Did Dead Sea have a mature right to remove? | 1344 |
| | C. Removal by Shell | 1346 |
| | 1. Medical monitoring | 1346 |
| | 2. Treaty rights | 1347 |
| | 3. Foreign relations | 1348 |
| | D. Is Remand Warranted? | 1349 |
| IV. | Dismissal Motions | 1351 |
| | A. Which Dismissal Motion Should Be Resolved First? | 1351 |
| | B. Have Defendants Waived the Right to Seek Forum Non Conveniens Dismissal? | 1351 |
| | 1. Have defendants waived the right to seek dismissal by relying on Tex.Civ.Prac. & Rem.Code Ann. § 71.031 as a basis for federal jurisdiction? | 1351 |
| | 2. Have defendants waived the right to seek dismissal by pursuing transfers of several cases to this court from other districts pursuant to 28 U.S.C. § 1404(a)? | 1352 |
| | 3. Did Dow waive the right to seek dismissal by initiating a declaratory judgment action in the United States District Court for the Northern District of Texas? | 1353 |
| | 4. Have defendants waived the right to seek dismissal by participating in discovery? | 1355 |
| | C. Forum Non Conveniens | 1355 |
| | 1. Standard of review | 1355 |
| | 2. Availability of an adequate alternative forum | 1356 |
| | a. Availability | 1356 |
| | b. Adequacy | 1357 |
| | i. Burkina Faso | 1358 |
| | ii. Costa Rica | 1358 |
| | iii. Dominica | 1359 |
| | iv. Ecuador | 1359 |
| | v. Guatemala | 1361 |
| | vi. Honduras | 1361 |
| | vii. Ivory Coast | 1361 |
| | viii. Nicaragua | 1362 |
| | ix. Panama | 1362 |

| | Page |
|---|---|
| x. The Philippines | 1362 |
| xi. Saint Lucia | 1365 |
| xii. Saint Vincent | 1365 |
| c. Conclusion | 1365 |
| 3. Private interest factors | 1365 |
| a. The relevant deference | 1365 |
| b. Balancing the interests | 1366 |
| i. Relative ease of access to sources of proof | 1366 |
| ii. Availability of compulsory process for attendance of unwilling witnesses and the costs of obtaining attendance of willing witnesses | 1367 |
| iii. Possibility of view of premises | 1368 |
| iv. Other practical problems that make trial of a case easy, expeditious, and inexpensive | 1368 |
| v. Will a foreign judgment be enforceable? | 1369 |
| vi. Was defendant's motion to dismiss filed in a timely manner? | 1369 |
| c. Conclusion | 1369 |
| 4. Public interest factors | 1370 |
| a. Balancing the interests | 1370 |
| i. Localized controversies | 1370 |
| ii. Interest in having diversity cases tried by a court that is "at home" with the law that must govern the action | 1370 |
| iii. The avoidance of unnecessary problems in conflict of laws or in the application of foreign law | 1371 |
| iv. The unfairness of burdening citizens in an unrelated forum with jury duty | 1371 |
| b. Conclusion | 1371 |
| V. Conclusion and Order | 1372 |
| A. Issues Concerning the Propriety of Removal | 1372 |
| 1. FSIA jurisdiction | 1372 |
| 2. Defects in removal procedure | 1372 |
| 3. Remand and retention | 1372 |
| B. Issues Concerning Dismissal of Parties and Actions | 1372 |
| 1. Forum non conveniens | 1372 |
| a. Dismissal | 1372 |
| b. Injunctive relief | 1373 |
| c. Return | 1375 |
| 2. Other motions | 1375 |

---

## I. *Introduction*

This action is a consolidation of several personal injury suits filed in various Texas courts pursuant to Tex.Civ.Prac. & Rem. Code Ann. § 71.031.[1] All but a few of the thousands of plaintiffs are citizens of twelve foreign countries who seek damages for injuries stemming from alleged exposure to a nematocide, dibromochloropropane (DBCP), while working on farms in 23 foreign countries. Since their inception the cases have been mired in disputes concerning the parties' choice of forum. Plaintiffs seek to have all of the cases remanded to various Texas state courts where they were originally filed so that their claims may be adjudicated there. Because each case was commenced before September 1, 1993, each is controlled by the Texas Supreme Court's decision "that the legislature ... statutorily abolished the doctrine of *forum non conveniens* in suits brought under section 71.031." *Dow Chemical Co. v. Castro Alfaro,* 786 S.W.2d 674, 679 (Tex.1990), *cert. denied,* 498 U.S. 1024, 111 S.Ct. 671, 112 L.Ed.2d 663 (1991). Defendants seek to have a federal court maintain jurisdiction and then to dismiss the cases on the basis of *forum non conveniens.* To avoid this result plaintiffs have carefully sculpted their lawsuits to avoid federal jurisdiction.

---

**1.** Section 71.031 provides a Texas forum for a personal injury or wrongful death cause of action arising from actions that took place in a foreign country belonging to a citizen of a foreign country that has equal treaty rights with the United States.

To the uninitiated the fact that these cases have now reached federal court might signify that defendants have achieved their objective. However, the plot in this drama is much more complicated than can be appreciated by viewing just the first act. Therefore, before addressing the pending motions and the numerous and complex issues they raise, the court will first identify the players and describe the scene changes that have occurred to date.

## II. *Parties, Posture, and Pending Pleadings*

### A. *All Roads Lead to Houston*

1. *Delgado v. Shell Oil Co.*, No. H–94–1337

Plaintiffs in *Delgado* are residents of Costa Rica, Nicaragua, and Panama. They originally filed suit in the 212th District Court of Galveston County, Texas, against Shell, Chiquita Brands, Chiquita Brands International, Inc., Del Monte Fresh Produce, N.A., Del Monte Tropical Fruit Co., Dole Food Co., Inc., Dole Fresh Fruit Co., Dow Chemical Co., Occidental Chemical Corp., Standard Fruit Co., and Standard Fruit & Steamship Co. Defendants' initial attempt to remove the case to the Galveston Division of this district was rejected on April 20, 1993. *Rodriguez v. Shell Oil Co.*, 818 F.Supp. 1013 (S.D.Tex.1993) (Kent, J.) (remand required because plaintiffs' claims, even if preempted by the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA), did not present a removable federal question).

On January 7, 1994, the 212th District Court consolidated *Delgado* with another DBCP case pending in Galveston County, *Aguilar v. Shell Oil Co.*, No. 93–CV–0658 (56th Dist. Ct., Galveston County, Texas).[2] *Aguilar* was an uncertified class action on behalf of "[a]ll persons (and their spouses) in Costa Rica who have been adversely exposed to any nematocide containing the compound 1–2–Dibromo–3–Chloropropane designed, manufactured, marketed, distributed, or sold by one or more of the Defendants[3] ... [except] any person who has already commenced an individual civil action."[4]

On February 14, 1994, Del Monte Fresh Produce, N.A., filed its original answer. Pursuant to Tex.R.Civ.P. 38,[5] on March 15, 1994, Del Monte filed and served a third-party petition impleading Dead Sea Bromine Co., Ltd. (Dead Sea), an Israeli company that is a "foreign state" within the meaning of the Foreign Sovereign Immunities Act (FSIA),[6] and Dead Sea's American affiliate, Ameribrom, Inc. Del Monte's third-party petition alleged that Dead Sea manufactured and sold, and Ameribrom sold, DBCP to which plaintiffs may have been exposed. Dead Sea promptly removed the action to the Galveston Division pursuant to 28 U.S.C. § 1441(d). The case was assigned to Judge Kent as

---

2. The order consolidating the two cases is attached as Exhibit 19 to Dead Sea's First Supplement to the Record Following Removal. (Docket Entry No. 11 in H–94–1377) A previous version of the *Aguilar* case was commenced as Cause No. 93–005796 in the 270th District Court of Harris County, Texas, on February 10, 1993. Because the plaintiff non-suited the case on March 3, 1993, before it was removed to this court by Shell on March 5, 1993, the court dismissed the case. (Memorandum and Order and Final Judgment, entered June 16, 1993, Docket Entry Nos. 13 & 14 in H–93–0644, *aff'd*, No. 93–2647, 20 F.3d 1170 (5th Cir. Apr. 6, 1994)).

3. Plaintiffs in *Aguilar* named fewer defendants than plaintiffs in *Delgado*. Omitted from the list were Chiquita Brands, Chiquita Brands International, Inc., Del Monte Fresh Produce, N.A., and Del Monte Tropical Fruit Co.

4. Plaintiffs' Second Amended Petition in *Aguilar*, attached as Exhibit 1 to Dead Sea's First Supplement to the Record Following Removal, Docket Entry No. 11 in H–94–1377, at 4, ¶ 11.

5. Tex.R.Civ.P. 38 provides, in relevant part, that:

At any time after commencement of the action a defending party, as a third-party plaintiff, may cause a citation and petition to be served upon a person not a party to the action who is or may be liable to him or to the plaintiff for all or part of the plaintiff's claim against him. The third party plaintiff need not obtain leave to make the service if he files the third-party petition not later than thirty (30) days after he serves his original answer.

6. The Foreign Sovereign Immunities Act was originally enacted as Pub.L. No. 94–583, 90 Stat. 2892 (1976). It is now codified as amended, mostly, at 28 U.S.C. §§ 1602–1611.

Civil Action No. G–94–193. Judge Kent recused and the case was transferred to the Houston Division where it was assigned to the undersigned judge.[7]

The other defendants joined in the removal and (with the exception of Del Monte Fresh Produce, N.A.) filed cross-claims against Dead Sea, Ameribrom, and in some cases, each other. In response to plaintiffs' motion to remand defendants argued that federal subject matter jurisdiction was provided by the presence of Dead Sea in the case and by the existence of complete diversity of citizenship and federal questions. Shell also filed supplemental notices of removal asserting that plaintiffs' most recent amended petitions and other papers recently filed by plaintiffs raised new, removable, federal questions.

In a June 30, 1994, Memorandum and Order the court concluded that Dead Sea, as a foreign sovereign, had a right to remove the case,[8] but declined to decide whether Dead Sea's presence conferred subject matter jurisdiction until Dead Sea had an opportunity to fully present its sovereign immunity arguments. The court also deferred deciding whether alternative bases for subject matter jurisdiction existed until the parties submitted additional materials demonstrating the citizenship of Standard Fruit Co.

### 2. *Jorge Carcamo v. Shell Oil Co.*, No. H–94–1359

Plaintiffs (including intervenor-plaintiffs) in *Jorge Carcamo* are residents of Burkina Faso, Costa Rica, Dominica, Ecuador, Guatemala, Honduras,[9] Ivory Coast, Nicaragua, Panama, the Philippines, Saint Lucia, and Saint Vincent. They advance, as an uncertified class, claims on behalf of themselves and all others "exposed to DBCP, or DBCP-containing products, designed, manufactured, marketed, distributed or used by Shell Oil Company, Dow Chemical Company, Occidental Chemical Corporation ... or used by Standard Fruit Company, Standard Fruit and Steamship Co., Dole Food Company, Inc., Dole Fresh Fruit Company, Chiquita Brands, Inc., and Chiquita Brands International, Inc.,[10] between 1965 and 1990," [11] not only in their home countries but also in Argentina, Australia, Cameroon, Indonesia, Malaysia, Mexico, Papua New Guinea, Senegal, Tanzania, Thailand, and Venezuela, with the exception of anyone who is already a plaintiff in any of selected other DBCP cases already pending. On April 5, 1994, Dow Chemical Co. filed a third-party petition against Dead Sea, Ameribrom, and the Del Monte entities. Because the petition was filed more than 30 days after Dow had filed its answer, Tex. R.Civ.P. 38 obligated Dow to obtain leave of court to serve the petition. Although Dow had not yet obtained the required leave from the 23rd District Court of Brazoria County, Texas, Dead Sea nevertheless promptly removed the case to the Galveston Division where it was assigned to Judge Kent as Civil Action No. G–94–238. Judge Kent recused on April 12, 1994, and the case was transferred to the Houston Division where it was assigned to Judge Hittner.[12]

As in *Delgado*, defendants in *Jorge Carcamo* joined in Dead Sea's removal, asserted additional bases of federal subject matter jurisdiction, and filed cross-claims, and Shell filed supplemental notices of removal. Plaintiffs' motions for remand raised two procedural arguments not implicated in *Delgado*. Plaintiffs argued that Dead Sea's removal of *Jorge Carcamo* was procedurally defective because Dead Sea was never properly joined as a third-party defendant in state court due

7. Docket Entry No. 14 in H–94–1337.

8. *M & O I;* Docket Entry No. 86 in H–94–1337, at 6.

9. One person listed among the plaintiffs from Honduras apparently resides in California.

10. Defendants are thus the same group listed in *Delgado*, with the exception of Del Monte Fresh Produce, N.A., and Del Monte Tropical Fruit Co.

11. Plaintiffs' Seventh Amended Petition, *Jorge Carcamo v. Shell Oil Co.*, No. 93–C–2290 (23rd Dist. Ct. Brazoria County, Texas), attached as Exhibit 2(A) to Dead Sea's Notice of Removal, Docket Entry No. 1 in H–94–1359, at 4, ¶ 12.

12. Docket Entry No. 20 in H–94–1359.

to Dow Chemical's failure to obtain leave to implead it. Alternatively, plaintiffs argued that the court lacks jurisdiction because plaintiffs' Seventh Amended Petition (expressly renouncing any intention to pursue claims against Dead Sea or its affiliated companies) rendered Dead Sea's joinder fraudulent.

Unlike *Delgado* the complexity of issues in *Jorge Carcamo* continued to grow as new parties were added. On June 10, 1994, Magistrate Judge Crone granted Dow Chemical's motion for leave to serve an amended third-party complaint impleading not only Dead Sea, Ameribrom, and the Del Monte entities, but also AMVAC Chemical Corp., Saint Lucia Banana Growers Association, Saint Vincent Banana Growers Association, Dominica Banana Growers Association, and Programa Nacional de Banano, as additional third-party defendants.[13] On June 21, 1994, third-party defendant Del Monte Fresh Produce, N.A., filed a fourth-party complaint impleading Bromine Compounds Ltd., a wholly owned subsidiary of Dead Sea.

Although *Jorge Carcamo* stood in this posture on June 30, 1994, when the court granted Shell's unopposed motion to consolidate *Delgado* with *Jorge Carcamo*,[14] the entry and exit of parties continued. On November 18, 1994, the court dismissed third-party defendants Dominica Banana Growers Association, Saint Lucia Banana Growers Association, and Saint Vincent Banana Growers Association after defendants conceded they could not present facts justifying continued opposition to dismissal.[15] On March 21, 1995, the court granted the motion of Miguel A. Lazo Amaya, and other domiciliaries of Honduras, to join the action as a second group of interve-

nor-plaintiffs in *Jorge Carcamo*.[16] Finally, on May 24, 1995, the court dismissed third-party defendant Programa Nacional de Banano for lack of personal jurisdiction.[17]

### 3. *Rodriguez v. Shell Oil Co.*, H-94-3248

Plaintiffs in this action are citizens of Honduras and, with the exception of one Texas resident and one Michigan resident, are residents of Honduras. Defendants are the same as those in *Jorge Carcamo*. On April 6, 1994, Shell and the Chiquita entities filed third-party petitions against Dead Sea and Ameribrom. On April 7, 1994, before the 229th District Court of Jim Hogg County, Texas, had granted leave to serve the third-party petitions, Dead Sea removed the case to the Laredo Division of this district where it was assigned to Judge Kazen as Civil Action No. L-94-49. Defendants joined in the removal, articulated additional bases for federal subject matter jurisdiction, and filed cross-claims against Dead Sea, and Shell filed supplemental notices of removal. Plaintiffs moved to remand for the same reasons articulated in *Delgado* and *Jorge Carcamo*. On September 23, 1994, Judge Kazen granted Shell's motion to transfer the case to the Houston Division [18] where it was assigned to the undersigned judge. On December 20, 1994, the court entered an order consolidating the case with *Delgado, Jorge Carcamo*, and the next case in the litany, *Erazo*.[19]

### 4. *Erazo v. Shell Oil Co.*, H-94-3451

On August 24, 1993, Manuel Antonio Balderamos Erazo, a citizen of Honduras, commenced a DBCP action against Shell in the 206th District Court of Hidalgo County, Texas. Shell's initial attempt to remove the

---

**13.** (Docket Entry Nos. 33 & 34 in H-94-1359). Dow filed its motion on May 6, 1994 (Docket Entry No. 73 in H-94-1359), and Judge Hittner referred the motion to Judge Crone on May 16, 1994. (Docket Entry No. 38 in H-94-1359) Plaintiffs' motion for reconsideration of Judge Crone's decision (Docket Entry No. 93 in H-94-1359) was denied by the undersigned judge on November 18, 1994. (Docket Entry No. 191 in H-94-1337).

**14.** *M & O I*, Docket Entry No. 86 in H-94-1337; Docket Entry No. 102 in H-94-1359, at 15.

**15.** Docket Entry Nos. 182, 183, & 184 in H-94-1337, respectively.

**16.** Docket Entry No. 236 [granting Docket Entry No. 216] in H-94-1337.

**17.** Docket Entry No. 260 in H-94-1337.

**18.** Docket Entry No. 66 in H-94-3248.

**19.** Docket Entry No. 91 in H-94-3248.

action to the McAllen Division of this district met the same fate as the counterpart initial removal in *Delgado*.[20] On April 6, 1994, Shell filed a third-party petition against Dow Chemical Co., Occidental Chemical Corp., Dead Sea, Ameribrom Inc., and AMVAC Chemical Corp. Before the state court had granted leave to serve the third-party petition, Dead Sea removed the case to the McAllen Division where it was again assigned to Judge Hinojosa as Civil Action No. M–94–055. Defendants joined in the removal, articulated additional bases for federal subject matter jurisdiction, and filed cross-claims against Dead Sea, and Shell filed supplemental notices of removal. Plaintiffs moved to remand for the same reasons articulated in *Delgado* and *Jorge Carcamo*. On September 29, 1994, Judge Hinojosa granted Shell's motion to transfer the case to the Houston Division[21] where it was assigned to the undersigned judge. The court's December 20, 1994, Order consolidated this case with *Delgado*, *Jorge Carcamo*, and *Rodriguez*.[22]

 5. *Valdez v. Shell Oil Co.*, H–95–1356 & *Isae Carcamo v. Shell Oil Co.*, H–95–1407

Plaintiffs in *Valdez* are citizens of Burkina Faso, Dominica, Ecuador, Honduras,[23] Ivory Coast, the Philippines, Saint Lucia, and Saint Vincent. Defendants are the same as those in *Jorge Carcamo*. On April 5, 1994, Dow Chemical Co. filed a third-party petition against the Del Monte entities, Dead Sea, and Ameribrom. On April 6, 1994, before the 276th District Court of Morris County, Texas, had granted leave to serve the third-party petitions, Dead Sea removed the case to the Marshall Division of the Eastern District of Texas, where it was assigned to Judge Steger as Civil Action No. 2–94CV–69. Defendants joined in the removal, articulated additional bases for federal subject matter jurisdiction, and filed cross-claims against Dead Sea, and Shell filed supplemental notices of removal. Plaintiffs moved to remand for the same reasons articulated in *Delgado* and *Jorge Carcamo*.

On April 25, 1994, Shell moved to consolidate *Valdez* with *Isae Carcamo*, another DBCP case that had been removed to the Marshall Division of the Eastern District.[24] On June 3, 1994, Judge Steger referred all pretrial motions to Magistrate Judge Radford.[25] On March 23, 1995, Judge Radford

---

**20.** Order of Remand, *Erazo v. Shell Oil Co.*, No. M–93–208 (S.D.Tex. Jan. 5, 1994) (Hinojosa, J.), attached as Exhibit 3(G) to Dead Sea's Notice of Removal, Docket Entry No. 1 in H–94–3451.

**21.** Docket Entry No. 57 in H–94–3451.

**22.** Docket Entry No. 70 in H–94–3451.

**23.** At least two of the plaintiffs allegedly injured in Honduras, Juan Ramon Valdez and Genaro de Jesus Valdez Turcios, are residents of Texas.

**24.** Docket Entry No. 10 in H–95–1356. *Isae Carcamo*, an action commenced by an individual Honduran plaintiff in the 276th District Court of Morris County, Texas, on July 12, 1993, is procedurally most similar to *Delgado*. The original petition named only one defendant, Shell. Shell removed, asserting FIFRA preemption, and Judge Hall remanded for the same reasons articulated in *Delgado* and *Rodriguez*. (Order entered September 17, 1993, in *Isae Carcamo*, No. 2–93CV–0134, attached as Exhibit 4(O) to Dead Sea's Notice of Removal, Docket Entry No. 1 in H–95–1407). Plaintiff then amended his petition to add Dow, Occidental, the Dole entities, and the Standard Fruit entities. Dead Sea removed the action shortly after Dow filed a single pleading containing both its original answer and a third-party petition against Del Monte, Dead Sea, and Ameribrom on April 6, 1994. Once in federal court the action became Civil Action No. 2–94CV–73 and was assigned to Judge Hannah. Defendants joined in the removal, articulated additional bases for federal subject matter jurisdiction, and filed cross-claims against Dead Sea, and Shell filed supplemental notices of removal. Plaintiff moved to remand for the same reasons articulated in *Delgado*. On June 22, 1994, Judge Hannah ordered that *Isae Carcamo* be consolidated with *Valdez*. (Docket Entry No. 45 in H–95–1407; Docket Entry No. 73 in H–95–1356) On April 26, 1995, Judge Steger ordered the case transferred to this district (Docket Entry No. 49 in H–95–1407), where it was assigned to Judge Rosenthal and then consolidated with H–94–1337. (Notwithstanding their earlier consolidation in the Eastern District of Texas, *Isae Carcamo* and *Valdez* were separately transferred to this district.)

**25.** Docket Entry No. 59 in H–95–1356.

granted Dow's motion for leave to serve an amended third-party complaint impleading Dead Sea, Ameribrom, the Del Monte entities, AMVAC Chemical Corp., Saint Lucia Banana Growers Association, Saint Vincent Banana Growers Association, Dominica Banana Growers Association, and Programa Nacional de Banano, as third-party defendants in *Valdez*.[26] In light of that ruling and Dead Sea's waiver of sovereign immunity[27] Judge Radford found that federal subject matter jurisdiction existed over both *Valdez* and *Isae Carcamo*, and he denied plaintiffs' motions to remand in both cases.[28] Judge Radford also denied Shell's motion to transfer venue to the Houston Division of the Southern District.[29] After considering defendants' objections to Judge Radford's denial of Shell's motion to transfer venue, Judge Steger vacated the order, granted Shell's motion, and transferred the action to this court on April 26, 1995,[30] where it was assigned to Judge Werlein. On May 17, 1995, the undersigned judge entered an order consolidating *Valdez* (and *Isae Carcamo* ) with *Delgado, Jorge Carcamo, Rodriguez,* and *Erazo*.[31]

### B. *Common Contentions and Uncommon Questions*

The decision to consolidate these cases was premised on the prevalence of common parties and issues. Notwithstanding the number of common issues in the cases, there are some issues that are shared by fewer than all of the cases and some issues that are unique to each case. As the court explained during the December 16, 1994, scheduling conference, the consolidation of these cases does not result in complete unification. Each case retains its distinct substantive and procedural character.[32] The list of issues is therefore lengthy. The nuances distinguishing the manner in which an issue is implicated (and the reasons a particular issue is not implicated) in each case are also subtle and complex. The following prologue to the court's discussion merely categorizes the bulk of the issues and establishes the order in which the court will address them.

### 1. *Issues concerning the propriety of removal*

■ Plaintiffs argue that all of the cases must be remanded to state court pursuant to 28 U.S.C. § 1447(c) either because this court lacks subject matter jurisdiction or because the removals were procedurally defective. As detailed above, each case was removed to federal court by Dead Sea and Shell. In *M & O I* the court held that Dead Sea was capable of properly removing *Delgado* to this court because it was a foreign sovereign.[33] Since then Dead Sea has expressly waived the defenses of sovereign immunity and lack of *in personam* jurisdiction for purposes of these cases only.[34] Notwithstanding these

---

**26.** Docket Entry No. 138 in H–95–1356.

**27.** Docket Entry No. 125 in H–95–1356.

**28.** Docket Entry No. 137 in H–95–1356.

**29.** Docket Entry No. 136 in H–95–1356.

**30.** Docket Entry No. 147 in H–95–1356.

**31.** Docket Entry No. 254 in H–94–1337.

**32.** *McKenzie v. United States,* 678 F.2d 571, 574 (5th Cir.1982) ("[C]onsolidation does not cause one civil action to emerge from two; the actions do not lose their separate identity; the parties to one action do not become parties to the other."); *Kuehne & Nagel (AG & Co.) v. Geosource, Inc.,* 874 F.2d 283, 287 (5th Cir.1989) ("[W]e must view each consolidated case separately to determine the jurisdictional premise upon which each stands.").

**33.** In papers filed on June 29, 1995, plaintiffs argue that FSIA jurisdiction no longer exists because as of February or June of 1995 Israel no longer owned a majority of the shares of Dead Sea. The court is not persuaded by this argument. Since Israel owned a majority of the shares of Dead Sea when plaintiffs were allegedly exposed to DBCP manufactured by Dead Sea, FSIA jurisdiction exists notwithstanding subsequent changes in ownership. *Gould, Inc. v. Pechiney Ugine Kuhlmann,* 853 F.2d 445, 449–450 (6th Cir.1988); *General Electric Capital Corp. v. Grossman,* 991 F.2d 1376, 1380–82 (8th Cir. 1993).

**34.** As noted earlier, Dead Sea's waiver of sovereign immunity in *Valdez* and *Isae Carcamo* appears as Docket Entry No. 125 in H–95–1356. A similar waiver relating to the remaining cases appears as Docket Entry No. 218 in H–94–1337.

developments plaintiffs argue that Dead Sea was incapable of removing any of the cases, including *Delgado,* because Dead Sea had been fraudulently joined. Plaintiffs also argue that Dead Sea was incapable of properly removing *Jorge Carcamo, Rodriguez, Erazo,* and *Valdez* because when Dead Sea removed those cases it had not yet been joined as a party. These arguments require the court to determine whether Dead Sea properly removed the cases. If Dead Sea's removal was improper in any of the cases the court must also determine whether Shell's supplemental removal was proper.

### 2. *Issues concerning dismissal of parties and actions*

Plaintiffs alternatively argue that even if Dead Sea was not improperly joined, it and its affiliated companies should be dismissed from these cases because under Texas law defendants cannot state a meritorious claim for contribution or indemnity against Dead Sea or any of its affiliates. Once Dead Sea's dismissal is accomplished, plaintiffs urge the court to remand the cases to state court by declining to exercise supplemental jurisdiction over the underlying suits between plaintiffs and defendants. Defendants counter that before determining whether Dead Sea should be dismissed the court must determine whether the defendants' contribution and indemnity claims will be governed by Texas law or some other law. Defendants argue that the law governing the underlying suits between the plaintiffs and the defendants should also provide the rule of decision concerning the contribution and indemnity claims. Defendants argue that they have valid and extant claims for contribution and indemnity against Dead Sea under the laws of a number of the plaintiffs' home countries. Finally, defendants argue that, after resolving all of the issues concerning removal, the court should apply the doctrine of *forum non conveniens* and dismiss all of the cases.

### III. *Removal and Remand*

#### A. *Standard of Review*

■ "Section 1447(c) provides two grounds for remand: (1) a defect in removal procedure and (2) lack of subject matter jurisdiction." *Burks v. Amerada Hess Corp.,* 8 F.3d 301, 303 (5th Cir.1993). When considering a motion to remand the removing party bears the burden of showing that removal was proper. *Willy v. Coastal Corp.,* 855 F.2d 1160, 1164 (5th Cir.1988), *appeal after remand,* 915 F.2d 965 (5th Cir.1990), *aff'd,* 503 U.S. 131, 112 S.Ct. 1076, 117 L.Ed.2d 280 (1992). "This extends not only to demonstrating a jurisdictional basis for removal, but also necessary compliance with the requirements of the removal statute." *Albonetti v. GAF Corporation–Chemical Group,* 520 F.Supp. 825, 827 (S.D.Tex.1981). Because removal jurisdiction "raises significant federalism concerns," *Willy,* 855 F.2d at 1164, courts must construe removal statutes "narrowly, with doubts resolved in favor of remand to the state court." *Jefferson Parish Hosp. Dist. No. 2 v. Harvey,* 788 F.Supp. 282, 283–84 (E.D.La.1992). If there is any doubt that a right to removal exists, "ambiguities are to be construed against removal." *Samuel v. Langham,* 780 F.Supp. 424, 427 (N.D.Tex.1992).

■ Notwithstanding its duty to interpret removal statutes narrowly, a "District Court exceed[s] its authority in remanding on grounds not permitted by the controlling statute." *Thermtron Products, Inc. v. Hermansdorfer,* 423 U.S. 336, 345, 96 S.Ct. 584, 590, 46 L.Ed.2d 542 (1976). The Fifth Circuit has recently clarified the permissible grounds for remand:

> Generally, the remand of a case that has been removed to federal court is governed by statutory provisions found at 28 U.S.C. §§ 1441(c) and 1447(c).

> . . . . .

> Under these two sections, the district court has general authority to remand a case under any of the following circumstances: 1) it has discretion to remand state law claims that were removed along with one or more federal question claims; 2) it must act on a timely motion to remand based on a defect in removal procedure; and 3) it must remand a case over which it has no subject matter jurisdiction.

No other authority to remand a case is established by statute, but ... one additional jurisprudential authority for discretionary remand does exist.

*Buchner v. FDIC,* 981 F.2d 816, 819 (5th Cir.1993). "[A] district court has discretion to remand to state court a removed case involving [only] pendent claims upon a proper determination that retaining jurisdiction over the case would be inappropriate." *Carnegie–Mellon University v. Cohill,* 484 U.S. 343, 357, 108 S.Ct. 614, 623, 98 L.Ed.2d 720 (1988).

## B. *Removal by Dead Sea*

### 1. *Fraudulent joinder*

■ Plaintiffs argue that the court should ignore the fact that Dead Sea's presence in these lawsuits confers federal jurisdiction upon the actions because Dead Sea was "fraudulently joined." The question of fraudulent joinder typically arises when a diverse defendant removes an action on the basis of diversity jurisdiction despite the presence of one or more non-diverse defendants. The removing party will often attempt to convince the court to ignore the in-state defendant by arguing that it was fraudulently joined. "[T]o establish that an in-state defendant has been fraudulently joined, the removing party must show either that there is *no possibility* that the plaintiff would be able to establish a cause of action against the in-state defendant in state court; or that there has been outright fraud in the plaintiff's pleadings of jurisdictional facts." *B. Inc. v. Miller Brewing Co.,* 663 F.2d 545, 549 (5th Cir.1981).

■ The question of fraudulent joinder to defeat the right to remove an action to federal court is not implicated in these cases. The cases present the different issue of whether the removing defendants improperly attempted to create a right to remove them by collusively joining a third-party defendant. The cases thus raise the analytically distinct question whether the court lacks jurisdiction pursuant to 28 U.S.C. § 1359, which provides that "[a] district court shall not have jurisdiction of a civil action in which any party, by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction of such court."

Section 1359 is designed to prevent the litigation of claims in federal court by suitors who by sham, pretense, or other fiction acquire a spurious status that would allow them to invoke the limited jurisdiction of the federal courts. The purpose of the statute is to prevent the manipulation of jurisdictional facts where none existed before....

*Nolan v. Boeing Co.,* 919 F.2d 1058, 1067 (5th Cir.1990), *cert. denied,* 499 U.S. 962, 111 S.Ct. 1587, 113 L.Ed.2d 651 (1991). *See also* 14 Wright, Miller & Cooper, Federal Practice & Procedure, § 3637 at 90–94 (1985). In *Harvey Construction Co. v. Robertson–Ceco Corp.,* 10 F.3d 300 (5th Cir.1994), the court differentiated between the collusive manipulation of jurisdictional facts and the collusive manipulation of facts that merely affect the outcome of the case.

Although we note, without so finding, that there may be some truth to the allegations of collusion, we cannot sustain the jurisdictional dismissal of the indemnity claim. Whether the settlement [between the original plaintiff and the current plaintiff seeking indemnity] was collusive or not goes only to the merits of the action and does not affect the jurisdiction of the district court. We hold that the district court erred in dismissing Harvey's indemnity claim for want of subject matter jurisdiction.

. . . . .

On remand, if the district court determines that diversity exists between [the original plaintiff] and [the current defendant], it must find that the assignment of [the original plaintiff's] claims ... did not create collusive *jurisdiction* ....

*Id.* at 303–04 (emphasis in the original).

Plaintiffs do not suggest that Dead Sea's status as a foreign sovereign was collusively manufactured to establish federal jurisdiction. Nor do they argue that defendants could never have stated a claim for contribu-

tion or indemnity against Dead Sea.[35] Instead, plaintiffs argue that their pleadings, filed either immediately before or soon after removal, disclaiming any further intention of seeking recovery for damages caused by exposure to product manufactured, marketed, or sold by Dead Sea, together with post-removal settlement agreements between plaintiffs and Dead Sea, establish that Dead Sea was collusively joined. The court is not persuaded by plaintiffs' arguments because they relate to the merits of the third-party actions; they do not undermine any jurisdictional facts providing Dead Sea a right to remove these cases under 28 U.S.C. § 1441(d). Accordingly, the court concludes that § 1359 is not an impediment to jurisdiction in any of the consolidated cases.

### 2. *Prematurity*

■ Plaintiffs argue that Dead Sea improperly removed *Jorge Carcamo, Rodriguez, Erazo,* and *Valdez* because the state courts never authorized the impleading defendants to serve third-party petitions on Dead Sea. According to plaintiffs, this means that Dead Sea's removal was defective because Dead Sea was not yet a "defendant" in the cases when it removed them. Although the question is not entirely free from doubt and a rule of general applicability is not easily stated, a review of precedent convinces the court that plaintiffs' position is correct.

### a. *What law governs?*

■ "The right to remove a case from state to federal court derives solely from the statutory grant of jurisdiction in 28 U.S.C. § 1441...." *Willy v. Coastal Corp.*, 855 F.2d at 1164. Because "[t]he legislature or the judiciary of a state can neither defeat the right given by a constitutional act of congress to remove a case from a court of the state into ... [a] court of the United States nor limit the effect of such removal," *Goldey v. Morning News of New Haven*, 156 U.S. 518,

523, 15 S.Ct. 559, 561, 39 L.Ed. 517 (1895), federal law governs the decision whether Dead Sea had a mature right to remove these actions.

### b. *When does a defendant's right to remove mature?*

28 U.S.C. § 1441(d) affords a foreign sovereign the right to remove "[a]ny civil action brought in a State court against [it]...." Professor Moore interprets the identical language in the general removal provision, § 1441(a), to mean that "a civil action, to be removable, must have been 'brought' in a state court, *i.e.*, some proceeding ... must be pending before removal is in order; and until that time the petition for removal is premature." 1A James W. Moore, Moore's Federal Practice (Moore's), ¶ 0.157[4.—10] (footnote omitted). *See Goldey v. Morning News of New Haven*, 156 U.S. at 525, 15 S.Ct. at 562 ("[T]he suit must be actually pending in the state court before it can be removed....").

Whether a case has been "brought" or is "pending" is not always easy to determine. "If an action is commenced in a state court in accordance with its usual and normal procedure, then, of course, the action may be properly regarded as 'brought' for removal purposes. But ... something less than regular commencement will [sometimes] suffice." 1A Moore's, ¶ 0.157[4.—10] (footnote omitted). Professor Moore synthesizes the body of precedent examining when an original defendant's right to remove matures as establishing that a person not yet technically a defendant under state law can nevertheless remove the action provided that "the state's judicial machinery is set in motion against the defendant." 1A Moore's, ¶ 0.157[4.—10] (footnote omitted). Thus, one impressed with a successful *ex parte* application for a temporary restraining order has a mature right to remove even before process is issued on the underlying action for an injunction.[36]

---

**35.** Although plaintiffs argue that defendants have failed to show that any Israeli DBCP was used in some countries, and that the evidence of the use of Israeli DBCP in other countries is weak, there is evidence of the use of Israeli DBCP in at least one of the plaintiffs' home countries implicated

by plaintiffs' pleadings in each of these six consolidated cases.

**36.** *See, e.g., English v. Supreme Conclave, Improved Order of Heptasophs*, 235 F. 630, 631–32 (D.N.J.1916) ("Whatever the form of the pro-

The Fifth Circuit has applied the same rule to successful *ex parte* writ of attachment proceedings [37] and, recently, to a situation that had not yet ripened into formal state contempt proceedings where there would be "no meaningful delay between a party or witness' refusal to comply with a subpoena and the state court's right to hold the party or witness in contempt." [38]

In *FDIC v. Loyd,* 955 F.2d 316 (5th Cir. 1992), the Fifth Circuit held that the district court erred in *sua sponte* remanding a case 21 months after it had been removed on the ground that the removal was procedurally defective because it was not timely filed under 28 U.S.C. § 1446(b). One of the questions before the Fifth Circuit was "[w]hen did the case first become removable by the FDIC?" *Id.* at 326. The court resolved this question by stating that

> [b]ecause only the presence of the FDIC in the case provides federal jurisdiction, it would certainly appear that the FDIC first had to be a party before the case was removable to federal court.... [W]e hold that the FDIC cannot be considered a party for the purposes of § 1446(b) until it has made an appearance, voluntary or involuntary, in the state court case.

*Id.* at 326–27. The court also provided guidance concerning similar situations not involving the FDIC by stating that

> [c]ommon sense and the practicalities of pleading dictate that no non-party to a state court proceeding has a mature right to remove that proceeding to federal court.... We cannot imagine that a private person who was not a party to the

state court action could nevertheless remove the case to federal court. There is nothing to suggest such an indiscriminate right.

*Id.* In a later footnote the court added that "it should be clear, as a general principle, that the right to remove a case does not mature, or even come into being, until one claiming the right has become a party to that case." *Id.* at 327 n. 12.

### c. *Did Dead Sea have a mature right to remove?*

Plaintiffs argue that when Tex.R.Civ.P. 38 requires leave of court to serve a third-party petition, the putative third-party defendant's removal right cannot mature until leave is granted because, absent leave of court, a third-party defendant cannot be subjected to the judicial machinery of the state. [39] In *FDIC v. Klayer,* 519 F.Supp. 889, 891 (E.D.Ky.1981), the court adopted a similar argument in granting a motion to remand.

> The Counterclaim–Cross Claim [a pleading stating a counterclaim against FDIC and commencing a third-party action against a federal official] was not pending in the state court.... At the time the petition for removal was filed, the FDIC was resisting the filing of the Counterclaim–Cross Claim in the state court, and there is no assurance that the state court would have permitted it to be filed and process to issue thereon.

 It is undisputed that Dead Sea does not meet the test established in *Loyd:* Until the state court granted a third-party plaintiffs' motion for leave to implead Dead

ceeding to bring a defendant into court, a suit is brought when such defendant is subjected to judicial orders.... [T]he filing of an injunction bill in a state court, followed by an ad interim stay, pending the hearing of a rule to show cause why a preliminary injunction should not issue in said cause, is a suit within the meaning of the Federal Statute in question.").

**37.** *Dulion v. S.A. Lynch Enterprise Finance Corp.,* 53 F.2d 568, 569 (5th Cir.1931), *cert. denied,* 285 U.S. 540, 52 S.Ct. 312, 76 L.Ed. 933 (1932) ("Though no declaration had been filed when the removal was applied for ... the suit, shown by the attachment affidavit to be on a demand for

money, was removable.... In such a case as the instant one the levy of attachment is the commencement of the suit." (citations omitted)).

**38.** *Louisiana v. Sparks,* 978 F.2d 226, 232 (5th Cir.1992).

**39.** *See, e.g., Bilek & Purcell v. Paderwerk Gebr. Benteler GmbH & Co.,* 694 S.W.2d 225, 227 (Tex. App.—Houston [1st Dist.] 1985, no writ) (reversing default judgment against third-party defendant where record failed to demonstrate that required leave of court to implead was obtained).

Sea it had no right to appear voluntarily and it could not have been forced to appear involuntarily as a third-party defendant.[40] Relying on *Rodriguez v. Transnave, Inc.*, 8 F.3d 284 (5th Cir.1993), defendants argue that Dead Sea should nevertheless be allowed to remove these cases within 30 days after it received a courtesy copy of a pleading naming it as a third-party defendant because a third-party foreign sovereign should not have to take the risk that it may lose the right to remove if the state court fails to rule on the motion seeking leave to implead within that time. Although *Transnave, Inc.* does not involve improper removal[41] defendants' argument merits discussion.

■ Defendants' argument rests on the rule that the time for removal ordinarily begins upon receipt, "through service or otherwise" of the pleading first evidencing removability.[42] According to defendants, this rule means that a third-party defendant may lose the right to remove unless the state court rules on the motion for leave to implead within 30 days after the third-party

defendant receives a copy of the third-party petition. To avoid that possibility defendants argue that Dead Sea was entitled to remove when it received a copy of the third-party petition against it without waiting for the state court to act.

This potential inability to remove is not unique, however. For a number of reasons the time for removal may be triggered and expire before a particular defendant has an opportunity to remove the case. For example, in cases involving multiple defendants the time for removal begins when the first defendant's removal right matures. If the first defendant to be served fails to remove timely, later-served defendants may lose the right to remove. *Brown v. Demco, Inc.*, 792 F.2d 478, 481–82 (5th Cir.1986). It would therefore not necessarily be unjust to hold that a foreign sovereign, third-party defendant can similarly lose the right to remove if it fails to correctly determine when the right to remove matures. Furthermore, Congress foresaw that time delays inherent in instituting actions against foreign entities might hin-

**40.** Unlike the FDIC, a foreign sovereign cannot obtain the right to remove pursuant to § 1441(d) through intervention. *J. Baxter Brinkman Oil & Gas Corp. v. Thomas*, 682 F.Supp. 898, 900 (N.D.Tex.1988).

**41.** In *Transnave, Inc.*, plaintiff incorrectly named a domestic corporation, Transnave, Inc., instead of Transportes Navieros Ecuatorianos, a foreign sovereign, as the defendant. Nevertheless, the foreign sovereign removed the action after receiving a courtesy copy of the state court petition. The Fifth Circuit held that the foreign sovereign did not waive its immunity defense by voluntarily removing the case from state to federal court before plaintiff had corrected the error or by participating in discovery and other pretrial matters once in federal court. *Id.* at 288–90.

Because subject matter jurisdiction existed over the dispute concerning the foreign sovereign's immunity defense, *see* 28 U.S.C. §§ 1330, 1602, plaintiff in *Transnave* had 30 days in which to move for remand or waive all non-jurisdictional removal defects, including the question whether the foreign sovereign had a mature right to remove before being properly substituted for the incorrectly named defendant. *In re Shell Oil Co.*, 932 F.2d 1518, 1523 (5th Cir.1991), *cert. denied sub nom. Castillo v. Shell Oil Co.*, 502 U.S. 1049, 112 S.Ct. 914, 116 L.Ed.2d 814 (1992)

(objections to procedural defects in removal not voiced within the 30–day time period provided by 28 U.S.C. § 1447(c) are waived). Although neither the Fifth Circuit nor the district court, *Rodriguez v. Transnave, Inc.*, 810 F.Supp. 194 (S.D.Tex.), *rev'd*, 8 F.3d 284 (5th Cir.1993), refer to the issue of waiver, the docket sheet in *Rodriguez v. Transnave, Inc.*, No. H–90–3445 (S.D.Tex.), indicates that plaintiff never filed a motion to remand. Because plaintiff failed to move for remand neither court could address any procedural defects. *Loyd*, 955 F.2d at 322 ("[W]e interpret the first sentence of § 1447(c) as precluding all remands for procedural defects after the expiration of the thirty-day remand period...."); *In re Allstate Ins. Co.*, 8 F.3d 219, 223 (5th Cir.1993) ("[W]e can discern no basis ... for conferring upon the district courts discretion *sua sponte* to remand for purely procedural defects ..." even if the court acts within the thirty-day remand period.). The holding of *Transnave, Inc.* thus sheds no light upon Dead Sea's right to remove.

**42.** 28 U.S.C. § 1446(b); *Chapman v. Powermatic, Inc.*, 969 F.2d 160, 161 (5th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1402, 122 L.Ed.2d 774 (1993) ("[I]f the case stated by the initial pleading is removable, then notice of removal must be filed within thirty days from the receipt of the initial pleading by the defendant.").

der prompt action by foreign sovereign defendants. Thus, "[w]here removal is based upon [§ 1441(d)] the time limitations of section 1446(b) ... may be enlarged at any time for cause shown." 28 U.S.C. § 1441(d).

▇▇▇ In Texas, where leave of court to serve a third-party petition is sometimes required, a foreign sovereign that receives no more than a courtesy copy of a third-party petition might not know whether the removal clock had begun ticking. The remover bears the burden of proving that removal was proper, however, and this burden includes the task of determining, upon receipt of a variety of papers, whether the right to remove has ripened. *Cf.* § 1446(b) (placing burden to discover whether a case is removable upon the defendant by providing that the removal clock can be triggered by "service of summons ... if such initial pleading has then been filed in court and is not required to be served on defendant....").

In *Jorge Carcamo, Rodriguez, Erazo,* and *Valdez* inquiries by Dead Sea would have revealed that it could not be subjected to the judicial machinery of the state (and therefore that Dead Sea could safely ignore the third-party petitions) until a state court granted leave to implead Dead Sea. Dead Sea's removal right would not mature (and the removal clock would not begin) until Dead Sea received a paper, through service or otherwise, indicating that the court had granted leave to serve a third-party petition on Dead Sea. Because Dead Sea did not have a mature right to remove *Jorge Carcamo, Rodriguez, Erazo,* or *Valdez* when it removed them, the court concludes that Dead Sea's removal of these cases was premature.

### C. *Removal by Shell*

▇▇▇ The conclusion that Dead Sea prematurely removed *Jorge Carcamo, Rodriguez, Erazo,* and *Valdez* is not dispositive of the overall question whether the cases were properly removed because in each case Shell filed supplemental removal notices. Although it is undisputed that Shell's removal notices were filed more than 30 days after the first defendant received plaintiffs' initial pleadings in each case, Shell advances three arguments why its supplemental removal notices were proper. In general,

> [t]here are two different contexts in which delayed removal is permissible. In one, the plaintiff, after commencing suit in state court, takes some action that makes a previously unremovable case removable. In the other, the initial pleading is incomplete in a way that conceals its removability, but the process of litigation reveals its removability.

*Gruner v. Blakeman,* 517 F.Supp. 357, 361 (D.Conn.1981). Shell's arguments implicate both of these contexts.

#### 1. *Medical monitoring*

▇▇▇ Shell first argues that these cases were properly removed because plaintiffs' Sixth Amended Petitions in *Jorge Carcamo* and *Delgado* and plaintiffs' Fifth Amended Petition in *Rodriguez* added claims relating to medical monitoring costs which, for the first time, sufficiently implicated the federal common law of foreign relations to confer federal question jurisdiction on the entire action. For this proposition defendants principally rely on *Sequihua v. Texaco, Inc.,* 847 F.Supp. 61 (S.D.Tex.1994). Plaintiffs in *Sequihua* prayed for the creation of a trust fund and for court supervision of "a medical monitoring scheme of unknown cost, scope or duration for as many as 500,000 Ecuadoran citizens over the protest of the government of Ecuador." *Id.* at 63. Plaintiffs in the instant cases, on the other hand, simply pray for "judgment against Defendants, and each of them, jointly and severally, for general and special damages ..." including the costs of "medical testing, evaluation, examination, and other related expenses."[43] Regardless

---

43. Plaintiffs' Sixth Amended Petition in *Jorge Carcamo,* attached as Exhibit A to Shell Oil Co.'s Notice of Joinder in Removal and Supplemental Notice of Removal, Docket Entry No. 5 in H–94–1359, at 17, ¶¶ 48(c) & *ad damnum;* Plaintiffs' Sixth Amended Petition in *Delgado,* attached as Exhibit A to Shell Oil Co.'s Notice of Joinder in Removal and Supplemental Notice of Removal, Docket Entry No. 9 in H–94–1337, at 15–16, ¶¶ 41(d) & *ad damnum;* Plaintiffs' Fifth Amended Petition in *Rodriguez,* attached as Exhibit B to Shell Oil Co.'s Notice of Joinder in Removal and Supplemental Notice of Removal, Docket Entry

of whether the substantive law ultimately applied to plaintiffs' claims will afford such a remedy, amendments that accomplish nothing more than the addition of a prayer for the recovery of a sum of money to compensate for this type of damages do not change the nature of plaintiffs' claims to give rise to a newly discoverable federal question. Accordingly, even if the court were to conclude, as defendants have consistently argued, that plaintiffs' petitions include claims arising under the federal common law of foreign relations there is nothing sufficiently different about these amended pleadings to warrant the commencement of a new removal period. The court concludes that Shell's removal, insofar as it is predicated on the existence of plaintiffs' claims for medical monitoring, was fatally defective because the amendments do not present a newly removable federal question.

### 2. *Treaty rights*

 Shell also argues that plaintiffs' response to Dow's Motion to Dismiss for Lack of Subject Matter Jurisdiction in another DBCP case, *Borja v. Shell Oil Co.*, No. 93–320–F (116th District Court of Dallas County, Texas), was the first "litigational" paper that clarified plaintiffs' case in a way that allowed Shell to determine that all of these cases raised removable federal questions. Although admitting that early versions of plaintiffs' petitions in each case stated causes of action under Tex.Civ.Prac. & Rem.Code Ann. § 71.031 and that a plaintiff cannot avail himself of § 71.031 without showing that his home country has "equal treaty rights" with the United States, Shell argues that plaintiffs' response to Dow's Motion to Dismiss in *Borja* first identified the existence of federal questions relating to "the existence, interpretation, effect, and/or validity of treaties between the United States and [numerous] nations ... as well as the alleged

applicability of certain multilateral agreements." [44] Shell argues that all of these cases therefore fall squarely into the second category of cases allowing delayed removal. Shell's argument is not new. A nearly identical argument was advanced and rejected in *Lozano v. GPE Controls*, 859 F.Supp. 1036 (S.D.Tex.1994), and in *Deaker v. Bell Helicopter Textron, Inc.*, No. H–94–2387 (S.D.Tex. Sept. 21, 1994). Once again the court is not persuaded by this argument.

For purposes of the pending motion to remand only, the court assumes without deciding that prosecution of state law claims by citizens of foreign countries pursuant to § 71.031 presents a federal question. *See Kern v. Jeppesen Sanderson, Inc.*, 867 F.Supp. 525, 531 (S.D.Tex.1994) ("If no treaty exists or if Plaintiffs contend they are not relying on a treaty, they lack standing to sue. If there is a treaty, its construction permits removal based on federal question jurisdiction."). The *Lozano* court held that where "defendants were clearly aware of the foreign citizenship of the plaintiffs and the foreign situs of the explosion on which th[e] action is based when they were initially served with the complaint in 1988 ... defendants had sufficient knowledge of the applicability of the Texas treaty statute to plaintiffs' claims to assert the Texas treaty statute as a[ ] basis for removal ... in 1988." 859 F.Supp. at 1038. The court held that removal in July of 1994 was untimely. Similarly, in *Deaker*, the court explained that receipt on May 26, 1994, of plaintiff's admission that he had never been a citizen of the United States sufficiently clarified plaintiff's status as either a citizen of a foreign country or a stateless person to place defendants on notice that the action had become as removable as it would ever be.[45] Accordingly, the court held that removal effected on July 13, 1994, was untimely.

No. 9 in H–94–1337, at 14–15, ¶¶ 39(d) & *ad damnum.*

44. Shell Oil Co.'s Notice of Joinder in Removal and Supplemental Notice of Removal, Docket Entry No. 9 in H–94–1337, at 2, ¶ 3.

45. *Deaker v. Bell Helicopter Textron, Inc.*, No. H–94–2387, slip op. at 8–9.

Defendants cannot dispute that early versions of plaintiffs' petitions clearly identified that most of the plaintiffs claimed foreign citizenship and that all of their alleged injuries arose abroad. Neither can defendants dispute that the first defendant received these petitions many more than 30 days before Shell attempted to remove the cases. Moreover, the court cannot help noticing that the very paper Shell asserts provided the first indication of removability belies Shell's claim. In that paper plaintiffs state that

> Dow has filed a motion to dismiss the claims of the Guatemalan plaintiffs in this case on the ground that the Court lacks subject matter jurisdiction over those claims. Certain other defendants adopted Dow's motion. Dow contends that under ... § 71.031, a plaintiff bringing suit in Texas must come from a country which has "equal treaty rights" with the United States. If no such equal treaty rights exist, Dow argues, then the Court lacks subject matter jurisdiction over the plaintiff's claims. Dow contends that the United States and Guatemala do not share "equal treaty rights."[46]

It is obvious from this paper that defendants were aware of the dispute over the existence, interpretation, effect, and validity of treaties between the United States and other countries well before they received plaintiffs' response. Because Shell has failed to demonstrate that this knowledge arose less than 30 days before its removal notice was filed, the court concludes that Shell's attempt to predicate removal of these cases on the dispute over treaty rights was untimely.

### 3. Foreign relations

■ Finally, Shell argues that the existence of a removable federal question was first revealed by statements of the Ambassadors to the United States from Costa Rica and Honduras contained in letters to the court and to Secretary of State Warren Christopher. According to Shell these letters give rise to federal question jurisdiction because they indicate that the foreign relations of the United States will be affected by the decisions in these cases.

■ While it is true that "the body of law which pertains to ... issues of international dimension may be classified as federal common law,"[47] and that federal question "§ 1331 jurisdiction will support claims founded upon federal common law as well as those of a statutory origin,"[48] not every claim implicating the international law of foreign relations will give rise to federal question jurisdiction. Defendants must still demonstrate that plaintiffs' claims arise under federal law—i.e., that they satisfy the well-pleaded complaint rule.[49] See Aquafaith

---

**46.** Plaintiffs' Response to Defendant Dow Chemical Company's Motion to Dismiss for Lack of Subject Matter Jurisdiction in Borja v. Shell Oil Co., No. 93–320–F (116th District Court of Dallas County, Texas), attached as Exhibit C to Shell Oil Co.'s Notice of Joinder in Removal and Supplemental Notice of Removal, Docket Entry No. 9 in H–94–1337, at 1.

**47.** Chapalain Compagnie v. Standard Oil Co. (Indiana), 467 F.Supp. 181, 185 (N.D.Ill.1978). See also Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 425, 84 S.Ct. 923, 939, 11 L.Ed.2d 804 (1964) ("[A]n issue concerned with a basic choice regarding the competence and function of the Judiciary and the National Executive in ordering our relationships with other members of the international community must be treated exclusively as an aspect of federal law.").

**48.** Illinois v. City of Milwaukee, Wisconsin, 406 U.S. 91, 100, 92 S.Ct. 1385, 1391, 31 L.Ed.2d 712 (1972).

**49.** "[I]f a question of federal law does not appear on the face of a plaintiff's [well-pleaded] complaint, federal question jurisdiction does not exist...." Anderson v. American Airlines, Inc., 2 F.3d 590, 593 (5th Cir.1993). Perhaps the most famous statement of the well-pleaded complaint rule is that made by Justice Cardozo:

> How and when a case arises 'under the Constitution or laws of the United States' has been much considered in the books. Some tests are well established. To bring a case within the statute, a right or immunity created by the Constitution or laws of the United States must be an element, and an essential one, of the plaintiff's cause of action. The right or immunity must be such that it will be supported if the Constitution or laws of the United States are given one construction or effect, and defeated if they receive another. A genuine and present controversy, not merely a possible or conjectural one, must exist with reference thereto, and the controversy must be disclosed upon the face of the complaint, unaided by the answer or by the petition for removal.

Gully v. First Nat'l Bank in Meridian, 299 U.S. 109, 112–13, 57 S.Ct. 96, 97–98, 81 L.Ed. 70 (1936) (citations omitted).

*Shipping, Ltd. v. Jarillas,* 963 F.2d 806, 808 (5th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 413, 121 L.Ed.2d 337 (1992) ("Defense counsel's erudite arguments about the federal common law of foreign relations are foreclosed by the familiar well-pleaded complaint rule."); *Handel v. Artukovic,* 601 F.Supp. 1421, 1426 (C.D.Cal.1985) ("Plaintiffs' international law claims, like their treaty claims, must 'arise under' the 'laws of the United States' for jurisdiction to lie.").

Defendants argue that plaintiffs' petitions satisfy the well-pleaded complaint rule because plaintiffs' claims *should have included* allegations attacking the sufficiency of the programs and regulations adopted by their own governments to protect them from the injuries they suffered or to compensate them after they were injured. The court is not persuaded by this argument. Because plaintiffs' § 71.031 claims seek nothing but damages, defendants' argument amounts to no more than the fear that a state court might impose liability for actions taken abroad that did not violate local government regulations. To the extent that defendants seek to pursue a defensive strategy alleging that at least some of their actions should be insulated from liability because those actions were taken in compliance with regulations, programs, and policies of the United States government or one or more foreign governments, this strategy is insufficient to transform the *plaintiffs' claims* into federal questions. Thus, although important issues of international significance might be implicated by the decisions made by a state court in this case, because no removable federal question implicating the international law of foreign rela-

tions necessarily appears in any claim within plaintiffs' well-pleaded petitions, the court concludes that Shell's second supplemental removal notice fails to establish the existence of federal subject matter jurisdiction.

## D. *Is Remand Warranted?*

■■ Defendants, using the last removal arrows in their quiver, argue that *Jorge Carcamo, Rodriguez, Erazo,* and *Valdez* should not be remanded even if Dead Sea's removal of these cases was premature. They argue that "by virtue of the power granted under [28 U.S.C. §§ 1447(a) [50] and 1448,[51] the court] can grant ... leave to serve Dead Sea, thus eliminating plaintiffs' complaint and allowing this litigation to proceed to an efficient conclusion." [52] Once again the parties have identified an issue that defies a categorical response, for the same case that instructs this court to evaluate a party's "power to remove ... at the time of removal," also applied 12 U.S.C. § 1819(b)(2) retroactively to cure jurisdictional defects that existed when the Federal Savings and Loan Insurance Corporation (FSLIC) effected its removal. *FSLIC v. Griffin,* 935 F.2d 691, 696 (5th Cir.1991). Defendants do not cite, and the court's independent research has failed to uncover, a single case employing § 1447(a) or § 1448 (or any of the federal statutes that are the predecessors of these sections) retroactively to correct a private party's premature removal.

The court need not plumb these uncharted waters with respect to *Rodriguez* or *Erazo,* however, because even if §§ 1447(a) and 1448 empower the court to do so, neither these statutes nor Fed.R.Civ.P. 14(a) [53] compels

---

**50.** Section 1447(a) provides that "the district court may issue all necessary orders and process to bring before it all proper parties whether served by process issued by the State court or otherwise."

**51.** The first paragraph of § 1448 states:

In all cases removed from any State court to any district court of the United States in which any one or more of the defendants has not been served with process or in which the service has not been perfected prior to removal, or in which process served proves to be defective, such process or service may be completed or new process issued in the same manner as in cases originally filed in such district court.

**52.** Dow Chemical Company's Memorandum in Opposition to Plaintiffs' Emergency Motion to Remand and Intervenors' Motion to Remand, Docket Entry No. 16 in H–94–1359, at 19.

**53.** Rule 14(a) provides, in relevant part, that

[a]t any time after commencement of the action a defending party, as a third-party plaintiff, may cause a summons and complaint to be served upon a person not a party to the action who is or may be liable to the third-party plaintiff for all or part of the plaintiff's claim against the third-party plaintiff. The third-party plaintiff need not obtain leave to make the service if the third-party plaintiff files the third-party complaint not later than 10 days

that result. The court is persuaded that it should not grant leave to serve third-party petitions on Dead Sea in either *Rodriguez* or *Erazo*. In addition to amending their pleadings and filing stipulations reflecting their intention not to pursue relief from injuries arising from Dead Sea's products, plaintiffs have also entered settlement agreements with Dead Sea. Under these circumstances the court is unwilling to usurp the state courts' authority to examine, in the first instance, whether Dead Sea should be impleaded into the case at this point in the litigation. *Cf. International Primate Protection League v. Tulane Educational Fund*, 500 U.S. 72, 86–89, 111 S.Ct. 1700, 1709–10, 114 L.Ed.2d 134 (1991) (remanding action against federal agency instead of upholding dismissal for plaintiffs' lack of federal constitutional standing because post-remand determination whether federal agency is an indispensable party and whether plaintiffs should be allowed to substitute an individual federal official for the federal agency would be determined by state law). Accordingly, the court concludes that *Rodriguez* and *Erazo* should be remanded.[54]

In *Jorge Carcamo* and *Valdez*, however, the question is more complex. In these cases federal courts allowed Dow to file an amended, third-party complaint against Dead Sea pursuant to Fed.R.Civ.P. 14(a).[55] Were the court to remand these actions in their current posture plaintiffs would be powerless to delay Dead Sea from immediately exercising its presently mature right to again remove the actions to federal court. The court will not subject the parties to the unnecessary expense and potential delay inherent in such circularity of litigation.[56] Accordingly, while the court concludes that *Rodriguez* and

after serving the original answer. Otherwise the third-party plaintiff must obtain leave on motion upon notice to all parties to the action.

54. Because these cases will be remanded any unaddressed pending motion in these cases must be addressed to the state courts. Accordingly, the state courts must still determine whether Dead Sea should be joined and may also consider whether any defendant's special appearance should be granted.

55. The court is not persuaded by plaintiffs' recent argument that the propriety of the court's order granting Dow's motion for leave to serve an amended third-party complaint against Dead Sea, *et al.*, in *Valdez* is questionable because Israel no longer owned a majority of Dead Sea when the order was entered. As explained in note 33, *supra*, the dispositive date is when plaintiffs' alleged exposure to DBCP occurred. At the time of plaintiffs' alleged exposure to DBCP manufactured by Dead Sea, Israel owned a majority of Dead Sea.

56. *See Fenelon v. Duplessis*, Nos. 91–0810, 91–1011 and 91–1012, 1991 WL 99391 at *1 (E.D.La. May 28, 1991), *aff'd without published opinion*, 997 F.2d 880 (5th Cir.1993) ("Finally, the defendants have noted that if this matter were remanded, it would be removed again under 28 U.S.C. § 2679(d)(2) ... [a] provision

[that] has no time limit. Thus, even if remand were proper in this case, it would be futile because this matter would once again be removed."). *See also Asarco, Inc. v. Glenara, Ltd.*, 912 F.2d 784, 787 (5th Cir.1990) (refusing to require remand that "would be a futile gesture, wasteful of scarce judicial resources ..." because state court would be bound by federal court's personal jurisdiction analysis); *Bell v. City of Kellogg*, 922 F.2d 1418, 1424–25 (9th Cir.1991) ("Where ... remand to state court would be futile ... the desire to have state courts resolve state law issues is lacking. We do not believe Congress intended to ignore the interest of efficient use of judicial resources.... The district court correctly resolved the whole case by dismissing it because a remand to state court would have been futile."); *cf. Mignogna v. Sair Aviation, Inc.*, 937 F.2d 37, 41 (2d Cir.1991) ("On the other hand, remand might be improper if it would be futile...."); *Hood v. Security Bank of Huntington*, 562 F.Supp. 749, 751 (S.D.Ohio 1983) ("If we were to dismiss plaintiff's claim against the [Small Business Administration] ... and ordered the case remanded to state court, the Bank would immediately exercise its right to implead the SBA as a third-party defendant. At that time, the SBA would have the right to have the case removed to federal court.... Because we do not view this as a very efficient use of either the Court's or the parties' time and energy, we have concluded that it is best to leave the parties as they stand....").

*Erazo* must be remanded because Dead Sea removed them prematurely, the court concludes that *Jorge Carcamo* and *Valdez* may remain in federal court.

## IV. *Dismissal Motions*

### A. *Which Dismissal Motion Should Be Resolved First?*

■ Plaintiffs ask the court to dismiss defendants' third-party actions against Dead Sea because they lack merit or to sever the third-party actions and then to remand the remainder of the actions to various state courts. Defendants ask the court to dismiss all of the actions in their entirety by declining to exercise jurisdiction under the doctrine of *forum non conveniens* (f.n.c.). The court is persuaded that it must examine defendants' motion first [57] in order to avoid the possibility of remanding any of the actions to an equally inconvenient state forum. *See Nolan v. Boeing Co.*, 919 F.2d at 1069–70 (rejecting plaintiffs' argument that "a federal court [should] remand rather than dismiss when a case is removed from a state court jurisdiction that would not dismiss on *forum non conveniens* grounds" because "[i]t would be anomalous to conclude that while a district court may properly invoke the federal law of *forum non conveniens* to decline jurisdiction over a properly removed case, it must order the case to be reinstituted in an equally if not more inconvenient forum"). Before addressing the merits of the motion to dismiss these actions for f.n.c., however, the court must first determine whether defendants have waived or should be estopped from asserting that this court is an inconvenient forum.

### B. *Have Defendants Waived the Right to Seek* **Forum Non Conveniens** *Dismissal?*

1. *Have defendants waived the right to seek dismissal by relying on* **Tex.Civ. Prac. & Rem.Code Ann. § 71.031** *as a basis for federal jurisdiction?*

■ Plaintiffs argue that defendants are not entitled to assert the federal law of *forum non conveniens* because they affirmatively asserted that federal question jurisdiction is provided by the "equal treaty rights" clause of § 71.031(a)(3). Without citing any authority plaintiffs urge the court to bind defendants to an application of the "anti-forum non conveniens dismissal provision" of that Texas statute. The court declines to do so because it is aware of no exception to the rule that "a federal court ... is required to apply the federal law of forum non conveniens when addressing motions to dismiss a plaintiff's case to a foreign forum ... in *all* cases regardless of their jurisdictional bases or subject matter." *In re Air Crash Disaster Near New Orleans, La.*, 821 F.2d 1147, 1159, 1163 (5th Cir.1987) (en banc) (emphasis in the original), *vacated sub nom. Pan American World Airways, Inc. v. Lopez*, 490 U.S. 1032, 109 S.Ct. 1928, 104 L.Ed.2d 400, *relevant holding reinstated*, 883 F.2d 17 (5th Cir.1989) (en banc).

Alternatively, to the extent that such an exception might exist in an appropriate case, the court is persuaded that the cases before it do not fall within the ambit of any exception. The crux of plaintiffs' argument is that defendants waived the right to seek f.n.c. dismissal by asserting that plaintiffs' § 71.031 causes of action present removable

---

**57.** Ordinarily "the doctrine of *forum non conveniens* can never apply if there is absence of jurisdiction or mistake of venue." *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 504, 67 S.Ct. 839, 841, 91 L.Ed. 1055 (1947). Accordingly, the court would ordinarily be forced to address the motions to dismiss for lack of personal jurisdiction over the Standard Fruit entities still pending in several of these cases before tackling the motion to dismiss for f.n.c. However, the court is persuaded that "this is one of the rare cases in which [it can] properly proceed to resolve the

forum non conveniens issues first, without the need to address the [*in personam*] jurisdictional contest ... [because] the arguments in favor of dismissal are strong, and the jurisdictional objections are inapposite to all but a few parties...." *Syndicate 420 at Lloyd's London v. Early American Ins. Co.*, 796 F.2d 821, 826 n. 8 (5th Cir. 1986). Moreover, the Standard Fruit entities have stipulated their willingness to delay consideration of their motions attacking personal jurisdiction until after the court has ruled on defendants' f.n.c. motion. (Docket Entry No. 258 in H–94–1337).

federal questions. To succeed in that assertion defendants would have to demonstrate that plaintiffs' state-law causes of action nevertheless "arise under" federal law because a question of federal law is an essential element of those claims. Viewed in this light the conclusion plaintiffs urge is illogical; surely defendants did not waive the right to seek application of federal f.n.c. law by attempting to demonstrate that federal law is an essential element of plaintiffs' state-law causes of action.

2. *Have defendants waived the right to seek dismissal by pursuing transfers of several cases to this court from other districts pursuant to 28 U.S.C. § 1404(a)?*

 Citing *Insurance Co. of North America v. Ozean/Stinnes–Linien,* 367 F.2d 224, 226–27 (5th Cir.1966) (reversing f.n.c. dismissal where f.n.c. motion was prosecuted only after defendant's motion to transfer from New Orleans to Savannah had been granted), plaintiffs argue that defendants waived the right to pursue f.n.c. dismissal in all of these cases when they sought transfer of *Valdez* and *Isae Carcamo* from the Marshall Division of the Eastern District of Texas to this court. The *Ozean/Stinnes–Linien* court predicated its decision on the inequitable conduct of the defendant:

> The transfer to the Southern District of Georgia, Savannah Division ... was "[f]or the convenience of the parties and witnesses" and presupposes that the case would be tried on its merits in the district court at Savannah....
>
> The libelant lost his choice of forum and had to prepare for trial in Savannah. The respondent cannot now be permitted to contend that, after all, Savannah is not the most appropriate place for a trial on the merits and, upon such contention, to have the libel dismissed.

*Id.* at 222–27. Accordingly, the court held that the language in defendant's brief in support of the motion to transfer amounted to a waiver of the right to later prosecute f.n.c. dismissal. *Id.* at 227.

Assuming *arguendo* that the holding of *Ozean/Stinnes–Linien* was not disturbed by the fact that in *Piper Aircraft Co. v. Reyno* 454 U.S. 235, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981) "the United States Supreme Court ... upheld, without any discussion of estoppel, a district court's dismissal under *forum non conveniens* even where the case had previously been removed to federal court and transferred to a different federal forum under § 1404(a)," [58] the transfer of *Valdez* and *Isae Carcamo* to this court was accomplished under very different circumstances from those present in *Ozean/Stinnes–Linien.*

In addition to filing a motion to consolidate *Valdez* and *Isae Carcamo* on April 25, 1994, Shell moved to transfer both cases to this court.[59] Of particular relevance to plaintiffs' current argument, the motion stated that "[w]hile no United States forum is truly convenient for these claims ... transfer of the consolidated case to the Houston Division, where two other related cases are currently pending, would be less inconvenient for both the parties and the witnesses." [60] Four days later, on April 29, 1994, the Chiquita entities joined Shell's motion.[61] Shell's Reply to Plaintiffs' Response and Opposition to Shell's Motion to Transfer, filed on May 27, 1994, notified plaintiffs and the court that "Shell does not intend by prosecuting this Motion to waive any *forum non conveniens* challenge or any other legal right it or other defendants might have" [62] and explained that transfer would further the interests of justice because "common issues in the related cases, such as federal jurisdiction, remand to state court, and *forum non conveniens,* should be dealt with at one time by one judge." [63] Al-

---

58. *Baumgart v. Fairchild Aircraft Corp.,* 981 F.2d 824, 835 (5th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 2963, 125 L.Ed.2d 663 (1993).

59. Docket Entry No. 11 in H–95–1356.

60. *Id.* at 2, ¶ 3.

61. Docket Entry No. 17 in H–95–1356.

62. Docket Entry No. 57 in H–95–1356, at 2 n. 2.

63. *Id.* at 5.

though the motions were denied by Magistrate Judge Radford,[64] Shell and the Chiquita entities sought review in the district court by filing objections to that order.[65] Among the arguments advanced by Shell and Chiquita for reversal of Judge Radford's order was the fact that submission of defendants' motion to dismiss for f.n.c. was soon to be filed in all of the cases that had been consolidated in this court. "To avoid unnecessary expenditure of judicial resources in ruling on essentially identical motions to dismiss for forum non-conveniens, this case should be transferred to the Southern District, Houston Division for consolidation with the other four DBCP cases pending there."[66]

A transfer order issued under the circumstances present in *Valdez* and *Isae Carcamo* is not the equivalent of the transfer order in *Ozean/Stinnes–Linien.* Plaintiffs lost their initial forum choice when Judge Radford denied their motions to remand the actions to state court[67] before Judge Steger transferred the cases to this court. Moreover, defendants' actions could not have given plaintiffs the false impression that transfer to this court would be followed by a trial on the merits in this court without further pretrial motions. Defendants repeatedly and vigorously asserted that they intended to seek f.n.c. dismissal of all cases once transfer was accomplished. The court is therefore persuaded that defendants did not waive the right to seek such dismissal in any of the papers relating to the motion to transfer in *Valdez* and *Isae Carcamo.*

3. *Did Dow waive the right to seek dismissal by initiating a declaratory judgment action in the United States District Court for the Northern District of Texas?*

Plaintiffs argue that by commencing a declaratory judgment action in the Northern District of Texas in 1993 asserting, *inter alia,* that plaintiffs' claims against Dow are preempted by FIFRA,[68] Dow waived its right to seek f.n.c. dismissal because it essentially admitted "that (1) federal district court in Texas [is] a convenient forum in which to litigate these claims; and (2) American law [is] applicable to Dow's conduct."[69] A waiver occurs when one voluntarily or intentionally surrenders a known right.[70] Although "[g]enerally, waiver is a fact question turning on the question of intent[,] ... the issue of waiver becomes a matter of law ... whe[n] material facts and circumstances are undisputed or clearly established and there is no room for argument or inference."[71]

It is undisputed that the state courts in which plaintiffs' actions were originally pending could not have ordered dismissal for f.n.c. Plaintiffs admit that Dow caused its declaratory judgment action to be voluntarily dismissed pursuant to Fed.R.Civ.P. 41(a) when plaintiffs' actions were removed to federal court by Dead Sea. Under the circumstances the court concludes that Dow did not voluntarily or intentionally surrender a right it then possessed or knew that it would possess in the future by filing its declaratory judgment action in federal court.

64. Docket Entry No. 136 in H–95–1356.

65. Docket Entry No. 144 in H–95–1356.

66. *Id.* at 3.

67. Docket Entry No. 137 in H–95–1356.

68. *Dow Chemical Co. v. Abarca,* No. 3–93–CV1686–X.

69. Plaintiffs' Response to Defendants' Motion to Dismiss on Forum Non Conveniens and Comity Grounds, Docket Entry No. 275 in H–94–1337, at 8.

70. *Salzstein v. Bekins Van Lines, Inc.,* 993 F.2d 1187, 1191 (5th Cir.1993); *First Interstate Bank of Arizona, N.A. v. Interfund Corp.,* 924 F.2d 588, 595 (5th Cir.1991) ("Under Texas law, waiver is a voluntary, intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right. The elements of waiver are: (1) an existing right, benefit, or advantage; (2) knowledge ... of its existence; and (3) actual intent to relinquish the right, which can be inferred from conduct." (citations omitted)).

71. *First Interstate Bank v. Interfund Corp.,* 924 F.2d at 595.

Though couched in terms of waiver plaintiffs' argument also appears to implicate one or more of the doctrines of estoppel. Defendants have submitted uncontradicted evidence that Dow's declaratory judgment action was dismissed before any adverse party answered and before the court took any action in the case. Accordingly, neither collateral estoppel [72] nor judicial estoppel [73] can bar Dow from taking its current position. There are two more doctrines of estoppel, however: equitable estoppel and quasi estoppel.

> Equitable estoppel serves to protect *litigants* from unscrupulous opponents who induce a litigant's reliance on a position, then reverse themselves to argue that they win under the opposite scenario. A party may invoke equitable estoppel to prevent the opposing party from changing positions if (1) the party was an adverse party in the prior proceeding; (2) the party detrimentally relied on the opponent's prior position; and (3) the party would now be prejudiced if the opponent changed positions.

*Teledyne Industries, Inc. v. NLRB,* 911 F.2d at 1220. *Accord, Joleewu, Ltd. v. City of Austin,* 916 F.2d 250, 252–53 (5th Cir.1990), *cert. denied,* 500 U.S. 904, 111 S.Ct. 1683, 114 L.Ed.2d 78 *vacated in part on unrelated grounds,* 934 F.2d 621 (5th Cir.1991) ("Under Texas law, one party may be estopped to assert a legal position against another if that position is inconsistent with a previous one.... [However, e]quitable estoppel bars the taking of inconsistent positions in judicial proceedings only if two other elements—reliance and injury of the opposing party—are also established."). Plaintiffs cannot establish either of the last two elements. Plaintiffs have made no showing that they detrimentally relied on Dow's conduct with respect to the current motions to dismiss for f.n.c. or that failure to estop Dow will prejudice plaintiffs. Moreover, even if Dow were estopped from pursuing f.n.c. dismissal, nothing prohibits any other defendant from arguing that the entire controversy—including the aspects relating to Dow's liability and defenses—should be dismissed.

> Quasi estoppel was developed to prevent a party from retaining a benefit by asserting a position to the disadvantage of another and then asserting a right which is inconsistent with that previous position. Quasi estoppel differs from equitable estoppel ... in that quasi-estoppel requires no concealment or misrepresentation of existing facts on the one side and no ignorance or reliance on the other.

> To create a quasi estoppel, [plaintiff] would have to show that [defendant] can be equitably charged with choosing to accept benefits in a manner genuinely inconsistent with his subsequent claim.

*Neiman–Marcus Group, Inc. v. Dworkin,* 919 F.2d 368, 371 (5th Cir.1990). The court is not persuaded that Dow can be equitably charged with "accepting" a benefit that is inconsistent with its current motion to dismiss simply because it filed and then abandoned an action that might have resulted in such a benefit. Accordingly, the court concludes that Dow did not waive and is not estopped from pursuing f.n.c. dismissal of these cases because of the declaratory judgment action it brought in the Northern District of Texas.

---

72. "Collateral estoppel ... prevent[s] a party from relitigating ultimate issues of fact that already have been resolved against that party.... The agreed orders entered previously by the court could not justify imposition of collateral estoppel because they did not constitute fully litigated and finally decided decisions on the merits." *Teledyne Industries, Inc. v. NLRB,* 911 F.2d 1214, 1220 (6th Cir.1990).

73. "Judicial estoppel applies where a party tries to contradict in a second lawsuit his sworn statement in previous litigation." *Grant v. Lone Star Co.,* 21 F.3d 649, 651 n. 2 (5th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 574, 130 L.Ed.2d 491 (1994). "The majority view is that judicial estoppel does not apply unless the party has been successful in persuading a court to accept its position." *Moore v. United Services Automobile Ass'n,* 808 F.2d 1147, 1153 n. 6 (5th Cir.1987). "We do not imply that judicial acceptance only occurs where a party ultimately prevails on the merits. 'Rather, judicial acceptance means only that the first court has adopted the position urged by the party, either as a preliminary matter or as part of a final disposition.'" *Teledyne Industries, Inc. v. NLRB,* 911 F.2d at 1218.

4. *Have defendants waived the right to seek dismissal by participating in discovery?*

Plaintiffs argue that "[b]ecause defendants have enjoyed the benefits of the American system [of discovery] for two years and because the competitive advantage they have obtained is fundamentally unfair, [d]efendants should be estopped from seeking forum non conveniens dismissal."[74] Although the amount of discovery that has taken place is a factor to be considered in determining whether a case should be dismissed for f.n.c., plaintiffs' argument is not tenable in these actions. The extent of discovery was discussed by the court and counsel for Dow, Walter F. Conrad, and plaintiffs' counsel, Charles Siegel, at a status conference on December 21, 1994:

> The Court: You all know a lot more about how much discovery was conducted before the cases were removed and how much has been conducted now and how much you have in other cases.
>
> Mr. Conrad: To bring the court up to date on that one, the amount of merits discovery is infinitesimal. Of 20,000 plaintiffs we have probably been able to depose 20. I would think that not until the jurisdictional questions are resolved do we get to the merits discovery part of the case. Both sides have agreed upon that. . . .
>
> Mr. Siegel: In one sense it is not true that the amount of merits discovery that has gone on is infinitesimal. It is true they have deposed 20 plaintiffs. We have taken a few depositions that we are just getting started on liabilit[y] issues when the cases were removed. But outside the formal discovery process, the plaintiffs have given to the defendants a tremendous amount of information, specifi-

cally a questionnaire . . . [and] several thousand medical tests.[75]

The court is not persuaded that defendants have waived or should be estopped from pursuing dismissal for f.n.c. because they engaged in this very limited discovery supplemented by informal, voluntary exchange of documents with plaintiffs.[76]

## C. *Forum Non Conveniens*

### 1. *Standard of review*

When considering a motion to dismiss for f.n.c. "the ultimate inquiry is where trial will best serve the convenience of the parties and the ends of justice." *Koster v. Lumbermen's Mutual Casualty Co.*, 330 U.S. 518, 527, 67 S.Ct. 828, 833, 91 L.Ed. 1067 (1947). "[T]he decision to grant or deny a motion to dismiss for forum non conveniens is within the discretion of the district court, [but] it should be an exercise in structured discretion founded on a procedural framework guiding the district court's decision-making process." *In re Air Crash Disaster Near New Orleans, La.*, 821 F.2d at 1165 (citations omitted).

The Fifth Circuit has fashioned "[a] *forum non conveniens* analysis involv[ing] a three step inquiry. First, the court must determine whether there exists another forum that is available to the litigants and would provide an adequate remedy to the prevailing party. . . ." *Baumgart v. Fairchild Aircraft Corp.*, 981 F.2d at 835.

> If the court concludes that the foreign forum is both available and adequate, it should then consider all of the relevant factors of private interest, weighing in the balance the relevant deference given the particular plaintiff's initial choice of forum. . . .

---

74. Plaintiffs' Response to Defendants' Motion to Dismiss on Forum Non Conveniens and Comity Grounds, Docket Entry No. 275 in H–94–1337, at 9.

75. Transcription of Hearing, Docket Entry No. 261 in H–94–1337, at 6–7.

76. Counsel for the Standard Fruit entities, Terry Murphy, provided evidence that plaintiffs derived some benefit from participating in voluntary transfer of documents because, at the same status conference, he reported that the defendants "did settle 50 of 20,000 cases after extensively going through the information th[ey] received from plaintiffs. . . ." *Id.* at 13.

If the district court finds that the private interests do not weigh in favor of the dismissal, it must then consider the public interest factors.

*In re Air Crash Disaster Near New Orleans, La.,* 821 F.2d at 1165. "[A] forum non conveniens dismissal must be based on the finding that, when weighed against plaintiff's choice of forum, the relevant public and private interests strongly favor a specific, adequate and available alternative forum." *Veba–Chemie A.G. v. M/V GETAFIX,* 711 F.2d 1243, 1245 (5th Cir.1983). Defendants bear the "burden of persuasion ... [as] to all the elements of the forum non conveniens analysis." *In re Air Crash Disaster Near New Orleans, La.,* 821 F.2d at 1164.

### 2. *Availability of an adequate alternative forum*

■ Because "[i]n all cases in which the doctrine of *forum non conveniens* comes into play, it presupposes at least two forums in which the defendant is amenable to process," *Gulf Oil Corp. v. Gilbert,* 330 U.S. at 506–07, 67 S.Ct. at 842, "[a] forum non conveniens dismissal should never be granted ... unless the defendant can satisfy the court that an adequate and available alternative forum exists." *Perusahaan Umum Listrik Negara Pusat v. M/V TEL AVIV,* 711 F.2d 1231, 1238 (5th Cir.1983). Determining whether an alternative forum is available and adequate is a two-step inquiry.

A foreign forum is available when the entire case and all parties can come within the jurisdiction of that forum. A foreign forum is adequate when the parties will not be deprived of all remedies or treated unfairly even though they may not enjoy the same benefits as they might receive in an American court.

*In re Air Crash Disaster Near New Orleans, La.,* 821 F.2d at 1165 (citations omitted).

### a. *Availability*

■ Plaintiffs, relying on *Fiacco v. United Technologies Corp.,*[77] argue that many of their home countries do not provide an available alternative forum because many of the defendants are not subject to personal jurisdiction in those courts. The Supreme Court's observation that "[o]rdinarily, th[e availability] requirement will be satisfied when the defendant is 'amenable to process' in the other jurisdiction," *Piper Aircraft Co. v. Reyno,* 454 U.S. at 255 n. 22, 102 S.Ct. at 265 n. 22, led the Fifth Circuit to hold that "defendant's submission to the jurisdiction of an alternative forum renders that forum available for the purposes of forum non conveniens analysis ... [and to conclude that] condition[ing] dismissal ... [upon] defendant's submission to the jurisdiction of an alternative forum is one particularly effective manner of assuring that the alternative forum is available." *Veba–Chemie A.G. v. M/V GETAFIX,* 711 F.2d at 1245, 1249.

Plaintiffs argue that consent by defendants may not be sufficient because the courts in several of their home countries will decline to exercise jurisdiction over consenting defendants because plaintiffs initiated the action elsewhere. In *Syndicate 420 at Lloyd's London v. Early American Ins. Co.* the court refined the holding in *Veba–Chemie A.G. v. M/V GETAFIX* in a way that satisfies plaintiffs' concerns:

[*Veba–Chemie A.G. v. M/V GETAFIX*] does not account for the possibility that, on issuance of the forum non conveniens dismissal and with complete compliance with the conditions imposed on that dismissal, the British courts would nonetheless decline to permit the joinder or intervention of the parties other than Syndicate 420, already an intervenor.

In order to ensure an available foreign forum, we make explicit the fact that the

**77.** 524 F.Supp. 858, 862 (S.D.N.Y.1981) (pre-*Piper Aircraft Co. v. Reyno* decision holding that "[w]here of two possible forums one is possible only because the defendant consents to make it possible by submitting to its jurisdiction, it seems to me that the ... relative criteria should weigh much more heavily. A plaintiff, who jurisdic-tionally has the right to proceed in one jurisdiction, should not ... be required to proceed if at all only in another jurisdiction where jurisdiction will exist not as a matter of law but as a matter of conscious choice on the part of the party against whom he seeks recovery.").

dismissal is conditioned upon the willingness of the English courts to hear this case as transferred by a sister American court. 796 F.2d at 830. To ensure availability of an alternative forum in the event that defendants' motion is ultimately successful the court will condition dismissal not only on the defendants' and third-party defendants' stipulation to waive all jurisdictional and limitations defenses but also upon acceptance of jurisdiction by the foreign courts involved in these cases.

■ Plaintiffs also argue that the courts of Nicaragua are unavailable because they are not functioning. Plaintiffs base this argument on the affidavit of Dr. Margarita Ramirez Tapia and a number of news articles describing a standoff between the legislature, the National Assembly, and the president, Violeta Barrios de Chamorro, concerning implementation of certain constitutional reforms. The standoff, which began in February of 1995, was precipitated by President Chamorro's refusal to publish the reforms enacted by the legislature. Among the reforms were provisions designed to control nepotism in the succession of presidents and provisions enlarging the supreme court from nine to twelve justices. The reforms also transferred the power to appoint supreme court justices from the president to the legis-lature. The supreme court refused to seat five new justices appointed by the legislature, and because only six active justices remained from the original contingent of nine, the court was unable to obtain a quorum necessary to resolve the impasse concerning the effectiveness of the constitutional reforms.

While this information is relevant to the function of the Supreme Court of Nicaragua, plaintiffs do not inform the court how this situation affects plaintiffs' access to a trial court in Nicaragua. Moreover, in the interim since plaintiffs briefed the issue, the bulk of the standoff—with the notable exception of the situation concerning the newly appointed supreme court justices—has been resolved.[78] Accordingly, the court concludes that the courts of Nicaragua remain available to plaintiffs.

### b. *Adequacy*

■ Plaintiffs argue that the courts of their home countries are inadequate because, in the event that each decides to apply its own law, none of them provide remedies that are comparable to the products liability cause of action available in a Texas forum applying Texas law (or the law of one or more other states of the United States). In many instances, however, plaintiffs inject considerations relevant only to a balancing of the litigants' various private interests [79] into their

---

78. *See, e.g., National Assembly Approves Constitutional Amendments*, Xinhua News Agency, July 4, 1995, *available in* LEXIS, News Library, Non–US file (describing National Assembly's July 4, 1995, vote to approve new constitutional amendments pursuant to the accord reached on June 30, 1995, between Chamorro and the National Assembly); *Chamorro Says Political Agreement Attests to "True Exercise of Democracy"*, BBC Summary of World Broadcasts, July 3, 1995, *available in* LEXIS, News Library, Non–US file (presidential speech stating that the final accord included the formation of a Supreme Electoral Council by consensus); David R. Dye, *A Chamorro Dynasty Dashed in Deal Struck in Nicaragua*, Christian Science Monitor, June 20, 1995, World sect., at 6.

79. For example, plaintiffs repeatedly argue that contingent attorney's fee contracts are either illegal or unethical in many of their home countries and that their expected recovery will be greatly diminished if they are forced to pursue an action in the courts of their home countries for a variety of reasons including the fact that most other countries do not employ civil juries; that many do not allow recovery of non-economic harm or punitive damages; that the number of witnesses will be severely limited and that a plaintiff or his family members may not be allowed to testify; or that deposition testimony cannot be substituted for the testimony of live witnesses. The court is persuaded that a forum that provides an impartial trier of fact and supplies an avenue to recover some measure of compensatory damages for physical injuries such as those suffered by plaintiffs is an adequate forum. All of the cases cited by plaintiffs are consistent with the view that after the Supreme Court's decision in *Piper Aircraft v. Reyno* the alleged deficiencies in the judicial systems of the plaintiffs' home countries are relevant only to the balancing of private interests that will be conducted in the event that adequate alternative fora are found to exist. *See, e.g., Coakes v. Arabian American Oil Co.*, 831 F.2d 572, 575–76 (5th Cir.1987) ("The Coakes' contention is simply that England is not an adequate alternative forum because it will not allow them to hire an English solicitor on a contingency-fee basis.... It is ... our view[, however,] that the fact that contingent fees are legally permissible in the United States but legally impermissible in England is not a factor that controls

argument concerning the court's review of the adequacy of an alternative forum. The Fifth Circuit has clarified that a court may conclude that an adequate alternative forum exists even though plaintiffs may not find a substantially comparable remedy in the foreign forum.

> *Piper Aircraft* held that a difference in the substantive law governing the action "should not be given conclusive or even substantial weight in the forum non conveniens inquiry." In *Piper* that meant that the unavailability of strict liability as a theory of recovery was insufficient to render a Scottish forum inadequate for the resolution of a products liability action. The Supreme Court recognized, however, that there will be circumstances in which the remedy afforded by the alternative forum will be so clearly inadequate or unsatisfactory "that dismissal would not be in the interest of justice." Those circumstances do not arise unless a party "will be deprived of any remedy or [will be] treated unfairly."

*Syndicate 420 at Lloyd's London v. Early American Ins. Co.*, 796 F.2d at 829. *Accord, Kempe v. Ocean Drilling & Exploration Co.*, 876 F.2d 1138, 1145 (5th Cir.), *cert. denied,* 493 U.S. 918, 110 S.Ct. 279, 107 L.Ed.2d 259 (1989) (declining to extend the rule that f.n.c. dismissal of actions involving only antitrust claims would be "the functional equivalent of denying the plaintiffs any remedy whatsoever" to an action that included a RICO claim that was not cognizable in Bermuda since plaintiffs' other tort claims were within the competence of "the Bermuda trial courts"). With this standard in mind the court will address the adequacy of the remedies available under the laws of plaintiffs' home countries.

### i. *Burkina Faso*

■ Defendants rely upon two affidavits prepared by the president of the Burkina Faso bar, Mr. le Batonnier Benoit Joseph Sawadogo. According to Mr. Sawadogo, workers who suffered injuries to their reproductive capacity as a result of exposure to DBCP in Burkina Faso may pursue a tort action against the entities that supplied that product to them in the courts of that country under a variety of provisions of the French Civil Code. While the affidavit of Dr. Bernardin Dabire submitted by plaintiffs does not contradict the relevant portions of Mr. Sawadogo's affidavit, Dr. Dabire questions whether any plaintiff will be able to maintain jurisdiction in Burkina Faso since all of the Burkina Faso plaintiffs were exposed to DBCP while working in the Ivory Coast and since none of the defendants are domiciled in Burkina Faso. Because any f.n.c. dismissal will be conditioned on defendants' waiver of jurisdictional defenses, the court is persuaded that Burkina Faso plaintiffs will not be treated unfairly or deprived of all remedies by the courts of that country.

### ii. *Costa Rica*

■ Defendants submit the affidavits of Dr. Atilio Vincenzi, a former Justice of the Supreme Court of Costa Rica. Dr. Vincenzi states that Article 1045 of the Civil Code provides a tort cause of action through which plaintiffs could pursue an action to recover damages from defendants for the injuries they suffered. Plaintiffs' fourth affiant on Costa Rican law, Professor Victor Perez Vargas, admits that "there is an abstract right to sue for damages ... in article 1045 of the Civil Code" but states that this should be ignored because "no injured person ... has ever filed an action based on a defective product against its manufacturers or distributors."[80] In the absence of evidence of an

---

or even significantly influences the *forum non conveniens* determination in this case."); *Reid–Walen v. Hansen,* 933 F.2d 1390, 1398–99 (8th Cir.1991) (considering "the realities of the plaintiff's position, financial and otherwise" including the lack of contingent fee arrangements in Jamaica, "[a]s part of the *Gilbert* private interest analysis....").

80. Similarly, plaintiffs' seventh affiant on Costa Rican law, Professor Dora Maria Guzman Zanetti, admits that "there is in Costa Rica sufficient substantive and procedural legislation, applied by judges who are capable technically and morally" to justly resolve this litigation, but states that the great number of plaintiffs would cause lengthy delays in the resolution of their cases.

officially recognized legal impediment the court concludes that plaintiffs will not be treated unfairly or deprived of all remedies in the courts of Costa Rica. Moreover, Professor Vargas' affidavit also demonstrates the existence of a remedy under the Labor Code that could result in recovery from the plaintiffs' employers or through the Costa Rican analog to workers' compensation insurance for partial or total permanent disability.[81]

### iii. *Dominica*

■■ Defendants submit the affidavits of Anthony Waddy Astaphan, Vice–President of the Dominica Bar Association. Mr. Astaphan states that the Commonwealth of Dominica "subscribes to and applies faithfully the English common law," and that the English common law provides plaintiffs a tort cause of action that might lead to the recovery of damages for their injuries from any of the defendants found negligent and causally responsible for the injury. Plaintiffs' affiants on the law of Dominica do not question the accuracy of this statement. Accordingly, the court concludes that plaintiffs will not be treated unfairly or deprived of all remedies in the courts of the Commonwealth of Dominica.

### iv. *Ecuador*

■■ Defendants submit the affidavits of Dr. Enrique Ponce y Carbo, a former Justice of the Supreme Court of Ecuador. Dr. Ponce y Carbo states that Articles 2241 and 2256(5) of the Civil Code provide causes of action by which plaintiffs may pursue recovery for their injuries from defendants in negligence and strict liability. He also states that injured workers may recover damages to reproductive capacity under the Labor Code.[82]

Plaintiffs counter with the affidavits of Professor Alberto Wray and Dr. Julio Cesar Trujillo, former Head Justice of the Tribunal of Constitutional Guarantees. Both affiants state that plaintiffs would be unable to pursue actions directly against the manufacturers of DBCP in Ecuador, but provide slightly different reasons for their opinions. Both state that a court in Ecuador could not assert personal jurisdiction over unwilling defendants whose only contact with the forum was plaintiffs' exposure in Ecuador to products placed into the stream of commerce by defendants outside of Ecuador. They also agree that plaintiffs could not recover under a breach of contract theory in any event because no contractual relationship exists between the workers and the manufacturers.

Although Dr. Trujillo acknowledges that "it would be possible [to bring] suits for damages ... against a company on the grounds of civil liability for defects in products manufactured by said company," he is not aware of any such suits in Ecuador, and in the present case states that such suits would be "pointless" because Ecuadorian courts would not have jurisdiction over the manufacturers.[83] Dr. Trujillo states that "the workers cannot sue said manufacturers in Ecuador[ ] because they do not have the procedural right to do so. Since no direct legal relationship, contractual or extra-contractual, exists between the manufacturers and the workers, the latter cannot sue the former in Ecuador." [84] Professor Wray states that workers could not pursue extra-contractual claims against the manufacturers because "there is no legal relationship that links the banana workers with the pesticide manufacturer." [85] In the next paragraph of his affidavit, however, Professor Wray acknowledges that Article 2241 of the Civil Code provides that "a person who suffers damage or injury as a consequence of the

---

81. *See* Articles 223 and 224 (¶¶ 434 & 435) of the Labor Code, translation of exhibits to Vargas' affidavit, at 6–7.

82. Dr. Ponce y Carbo acknowledges that no remedy for this type of injury is specified in the Code but contends that a remedy may nevertheless be fashioned by the Ministry of Labor.

83. Trujillo Affidavit, at 4.

84. Trujillo Affidavit, at 2.

85. Wray Affidavit, ¶ 8.

negligence or tort of another is entitled to bring an action against the latter for damages." [86] Professor Wray does not explain why the extra-contractual relationship established by Article 2241 does not provide Ecuadorian plaintiffs with a remedy against the manufacturer defendants.

Defendants respond to plaintiffs' affidavits with the affidavit of Professor Saul Litvinoff. Professor Litvinoff cites Article 2241 as one example of Code provisions establishing liability under the "civil law equivalent of the common law concept of tort . . . the notion of 'quasi-delict.'" [87] Professor Litvinoff also states that Article 2256(5) of the Civil Code provides a products liability cause of action to Ecuadorian plaintiffs against the manufacturers and distributors of DBCP and that he cannot understand the position taken by plaintiffs' affiants concerning the existence and effect of an extra-contractual relationship between the manufacturers and the workers. Professor Litvinoff appends an English translation of Article 2256 as part of Exhibit B to his affidavit. That provision reads, in its entirety:

> As a general rule, all damages that may be imputed to the malice or negligence of another person must be repaired by the latter.

> The following are particularly liable to such reparation:

> 1. One that provokes explosions or combustion in an imprudent manner.

> 2. One that imprudently fires a firearm.

> 3. One that removes slabs from a ditch or sewer pipes in a street or road, without taking the necessary precautions so that those in transit thereon by day or night do not fall.

> 4. One that, obligated to the construction or repair of an aqueduct or bridge that goes across a road, has it in a state of causing damage to those that travel upon it; and

> 5. One that manufactures and places in circulation products, objects, or artifacts, which, as a result of defects of elaboration or construction, cause accidents, shall be liable for the ensuing damages.

In a reply affidavit Professor Wray acknowledges this statute but attempts to limit its applicability by noting that

> The Supreme Court [of Ecuador] has held that this rule applies to a party selling a product intended as poultry feed if the consumption of said product causes the death of said poultry (*Gaceta Judicial, Series XV, No. 3, p. 567*). This application is relevant by virtue of the fact that there is a direct legal link between the manufacturer/dealer and the buyer who suffered the damages, but the parties who suffered in this case bought nothing.[88]

In light of the plain meaning of Article 2256(5) the court is unwilling to infer from a single case holding a manufacturer liable to the immediate purchaser of a product a rule that a manufacturer cannot be liable to anyone other than the immediate purchaser. The court is also reluctant to adopt Professor Wray's attempt to explain why the more general tort action provided by Article 2241 would not be available to plaintiffs. Professor Wray offers no proof beyond his own conclusory statement why the existence of an intermediate purchaser would preclude plaintiffs from pursuing an action to enforce the extra-contractual duty not to negligently or tortiously injure other persons imposed upon defendants by Article 2241. The court concludes that defendants have satisfied their burden to demonstrate that plaintiffs will not be deprived of all remedies in the courts of Ecuador.[89]

---

86. *Id.* at ¶ 9. Professor Wray hedges this statement by noting that negligence actions are rarely pursued in Ecuadorian courts.

87. Litvinoff Affidavit, ¶ 13.

88. Reply Wray Affidavit, ¶ 2.

89. Although plaintiffs' affiants also allude to difficulties that plaintiffs may encounter because of the class distinctions prevalent in Ecuador, they have not established that they would be treated unfairly by the *courts* of Ecuador.

## v. *Guatemala*

■ Defendants submit the declarations of Ricardo Sagastume Vidaurre, former Chief Justice of the Supreme Court of Justice of Guatemala. Mr. Vidaurre states that Article 1646 of the Civil Code provides a tort cause of action by which plaintiffs could recover damages from defendants for the injuries they suffered. He also states that by creating a rebuttable presumption of fault, Article 1648 places the burden to prove lack of fault on the defendants. Mr. Vidaurre also states that injured workers may pursue an action against their employers under the Labor Code and that Article 326 of the Labor Code provides a mechanism for joining the manufacturer of a harmful chemical because it enables plaintiffs to utilize the third-party practice provisions of the Code of Civil and Commercial Procedure. While plaintiffs' affiants on Guatemalan law question the accuracy of Mr. Vidaurre's statements concerning the Labor Code, they do not question that plaintiffs may pursue relief from their employers under the Civil Code.[90] Accordingly, the court concludes that plaintiffs will not be treated unfairly or deprived of all remedies in the courts of Guatemala.

## vi. *Honduras*

■ Defendants submit the affidavits of Professor Enrique Ortez Colindres. Professor Colindres states that Article 2236 of the Civil Code provides a tort cause of action through which plaintiffs could pursue an action to recover damages from defendants for the injuries they suffered. He also states that injured workers may seek compensation from their employers under the Labor Code or from the Honduran Social Security Institute, a workers' compensation program administered by the government. Plaintiffs counter with the affidavits of Enrique Flores Valeriano, a former judge of the Supreme Court of Justice, and Rene Velasquez Diaz, the General Director of the Attorney General's Office of the Department of Justice. Mr. Diaz states that plaintiffs' claims could only be brought in the labor courts, and, because there is no express provision in the Labor Code setting the amount of damages for the injury of sterility, plaintiffs cannot obtain any relief. While Mr. Valeriano agrees that plaintiffs could only proceed in the labor courts, he does not agree that all recovery is foreclosed because "in instances of professional risk where a worker incurs an injury whose compensation is not given in [the disability compensation] table ... the amount of compensation, according to the law, is to be set by a competent authority, based on testimony from three (3) Government doctors, at no cost whatever to the parties."[91] Because one of plaintiffs' affiants agrees that some measure of compensatory redress for their injuries is available in Honduras, the court concludes that plaintiffs will not be deprived of all remedies in the courts of Honduras and that plaintiffs would not be treated unfairly by the courts of Honduras.

## vii. *Ivory Coast*

Defendants submit the affidavits of Professor Jacqueline Lohoues–Oble, former Minister of Justice and Custodian of the Seals of the Republic of Cote d'Ivoire. In her original affidavit Professor Lohoues–Oble states that "[i]n summary, articles 1382, 1383 and

---

90. Affidavit of Francisco Villagran Kramer, former Vice President of the Republic of Guatemala, ¶ 7 ("[I]n spite of the fact that the labor law penalizes employers that cause injury, workers must go through the civil courts to claim compensation for damages...."). Plaintiffs also submit the affidavit of Jose Luis Gonzalez Dubon, produced by one or more of the defendants at an earlier stage of this litigation, in which Mr. Dubon contradicted both plaintiffs' and defendants' more recent affiants when he opined that "if the employees of a company are affected by any product that is not manufactured or made by the same company for which they work, they cannot claim or demand against the party that made, produced or manufactured the product which affected them." In the same affidavit, however, Mr. Dubon also opined that "[t]he first recourse of said employees is the Instituto Guatemalteco de Seguridad Social.... If the employer is not registered in said Institute, the employee may claim his indemnity for damages directly from his employer; as in accordance with Articles 1649 and 1650 of Guatemala's Civil Code...."

91. Valeriano Affidavit, ¶ 4.

1384 [of the Civil Code] collectively establish a judicial remedy that allows a party who has suffered an injury to be able to claim from all courts the corresponding compensation derived from same, whether or not the company in question is foreign or Ivorian." [92] In her supplemental affidavit Professor Lohoues–Oble states that "[p]laintiffs would have a remedy for any claim based on infertility. In effect infertility is classified as an injury to an individual's ability to enjoy the pleasure of life, for example the loss of marital enjoyment." [93] Plaintiffs' affiants on the law of the Ivory Coast do not question the accuracy of these statements. However, the affidavit of Christophe Kouakou raises a similar question identified by plaintiffs' affiant on the law of Burkina Faso; since many of the workers migrate from plantation to plantation, they may not be able to establish the specific place of injury. Because dismissal will be conditioned on defendants' waiver of jurisdictional defenses, the court concludes that plaintiffs who can meet the jurisdictional requirements of the courts of the Ivory Coast will not be treated unfairly or deprived of all remedies.

### viii. *Nicaragua*

Defendants submit the affidavits of Dr. Raul Barrios Olivares, an Associate Justice [94] of the Supreme Court of Nicaragua. Dr. Olivares states that under Article 2509 of the Civil Code, Article 89 of the Law on Insecticides, and Articles 82 through 110 of the Labor Code "an individual plaintiff in Nicaragua may bring an action in the appropriate judicial forum for personal injuries such as those alleged by the plaintiffs...." [95] Though several of plaintiffs' affiants take issue with Dr. Olivares' interpretation of the relevant provisions of the Labor Code, none contradict the conclusion that plaintiffs could pursue an action under Article 2509 of the Civil Code.[96] Accordingly, the court concludes that plaintiffs will not be treated unfairly or deprived of all remedies in the courts of Nicaragua.

### ix. *Panama*

Defendants submit the affidavits of Dr. Jorge Fabrega, an Alternate Justice of the Supreme Court of Panama. Dr. Fabrega states that "[p]ursuant to tort theories under [Articles 1644 and 1652a of] the Civil Code and [Articles 284 and 302 of the] Labor Code, an individual plaintiff in Panama may bring an action in the appropriate judicial forum for personal injuries such as those alleged by the plaintiffs...." [97] While plaintiffs' affiants state that the Labor Code does not provide an avenue of relief for loss of reproductive capacity, they admit that plaintiffs could pursue actions under Article 1644 of the Civil Code. Accordingly, the court concludes that plaintiffs will not be treated unfairly or deprived of all remedies in the courts of Panama.

### x. *The Philippines*

Defendants submit the affidavits of Jose F.S. Bengzon, Jr., a former president of the Philippine Bar Association. Mr. Bengzon concludes that "[p]ursuant to both contractual and tort theories of the Civil Code, an individual plaintiff in the Phillipines may

---

92. Lohoues–Oble Affidavit, ¶ 15.

93. Supplemental Lohoues–Oble Affidavit, ¶ 7.

94. Plaintiffs' affiants state that Dr. Olivares is only an alternate judge. Affidavit of Dr. Margarita Ramirez Tapia, former General Inspector for the Ministry of Labor, at 3; affidavit of Dr. Agustin Aleman Lacayo, a labor judge in Managua, Nicaragua, ¶ 10; supplementary affidavit of Dr. Mariano Barahona, ¶ I.

95. Olivares Affidavit, ¶ 24.

96. *E.g.*, Affidavit of Professor Marco Gonzalez–Pastora, ¶ 15 ("In Nicaragua, these cases must be

prosecuted under civil law instead of labor law...."); Affidavit of Professor Vilma Nunez de Escorcia, former Vice Chief Justice of the Supreme Court of Justice of Nicaragua, ¶ 3 ("In theory, the workers could bring suit in the civil courts.... A decision handed down by a civil court would be based on Article 2509 of the Civil Code."); Lacayo Affidavit, ¶ 3 ("[T]he right exists to claim compensation for damages in Nicaragua ... under Article 2509 of the Civil Code...."); Affidavit of Professor Rodolfo Sandino Arguello, ¶ 2.1 ("There is a general right under which a suit for damages could be brought, i.e., the 1904 Civil Code, which is still in effect.").

97. Fabrega Affidavit, ¶ 20.

bring an action in the appropriate judicial forum for personal injuries such as those alleged by the plaintiffs...."[98] Plaintiffs and their affiants disagree.

 Plaintiffs submit Opinion No. 52, S. 1995, issued by Demetrio G. Demetria, Acting Secretary of the Department of Justice of the Republic of the Phillipines in his capacity as the Attorney General. Plaintiffs argue that this opinion is conclusive as to the scope and effect of the law of the Phillipines.[99] While defendants question plaintiffs' argument they submit no evidence and cite no authority to the contrary.[100] Accordingly, the court accepts the Attorney General's statement that plaintiffs cannot pursue an action in contract against defendants pursuant to Article 1546 of the Civil Code because no contractual privity exists between plaintiffs and defendants. The court also accepts the Attorney General's statement that plaintiffs cannot pursue a strict products liability action against the manufacturer defendants pursuant to Article 2187 of the Civil Code because DBCP is not within the scope of items, such as "foodstuffs, drinks, toilet articles, and similar goods" covered by that provision. Moreover, the court accepts the Attorney General's statement that plaintiffs could not pursue recovery based upon theo-

ries relating to certain intentional torts recognized in common law countries pursuant to Article 2176. Notwithstanding all of these statements, Opinion No. 52, S. 1995, does not support the ultimate conclusion that plaintiffs would be deprived of all remedies in the Philippines because the opinion fails to address whether plaintiffs could pursue a remedy under a worker's compensation scheme or whether plaintiffs might have a viable action in negligence under Article 2176 or some other Code provision.

The remainder of plaintiffs' affiants on Philippine law attempt to fill in these gaps. Professor Perfecto V. Fernandez states that "[p]laintiff banana workers would be limited to remedies under the Labor Code of the Philippines or the Civil Code of the Philippines, for recovery of compensation or damages for injuries sustained."[101] With respect to claims under the Labor Code Professor Fernandez clarifies that the Labor Code was enacted in 1974 to replace the former Workmen's Compensation Act scheme involving private insurance with a government agency against which all claims seeking recovery from an employer for work related injuries are made.[102] After explaining that recovery under either the old or the new scheme[103] is restricted to injuries that inhibit a worker's ability to work[104] he concludes that "claims

---

**98.** Bengzon Affidavit, ¶ 16.

**99.** *See United States v. Pink*, 315 U.S. 203, 219, 62 S.Ct. 552, 560, 86 L.Ed. 796 (1942) (official declaration of the Commissariat for Justice of the Union of Soviet Socialist Republics concerning the extraterritorial effect of an earlier decree nationalizing the insurance industry was conclusive); *D'Angelo v. Petroleos Mexicanos*, 422 F.Supp. 1280, 1284–85 (D.Del.1976), *aff'd without opinion*, 564 F.2d 89 (3d Cir.1977), *cert. denied*, 434 U.S. 1035, 98 S.Ct. 770, 54 L.Ed.2d 783 (1978) (Attorney General opinion concerning effect of expropriation decree nationalizing petroleum resources held conclusive where evidence demonstrated that "in the absence of an adjudication by a Mexican court ... [the Attorney General] is not only the proper authority, but the highest and sole authority empowered to issue official legal opinions in response to a proper request.").

**100.** The Attorney General, in Opinion No. 52, S. 1995, states that "pursuant to law and precedent, the Secretary of Justice, as Attorney General, does not render opinion except for national government functionaries ... and then only on cases, controversies or matters actually arising in

the performance of their functions and duties." Nevertheless, he issued Opinion No. 52, S. 1995 "pursuant to the doctrine of parens patria[e]." Absent contrary authority in published judicial opinions the statements of the Attorney General in Opinion No. 52, S. 1995, must be treated as conclusive.

**101.** Fernandez Affidavit, ¶ 11.

**102.** *Id.* at ¶¶ 12–14.

**103.** In *Landicho v. WCC & Canlubang Sugar Estate*, 89 SCRA 147, 154 (1979), the Supreme Court of the Philippines applied the old worker's compensation law to a claim that arose from actions that occurred prior to passage of the new Labor Code. Because plaintiffs' claims arise from events that occurred both before and after passage of the new Labor Code the court must examine Professor Fernandez' statements under both regimes.

**104.** *See Lombo v. Standard Cigarette Mfg. Co.*, 58 SCRA 750, 759 (1974) (explaining that only injuries inhibiting a worker's capacity to work are

of the workers for employee compensation [based on infertility] would be denied, simply because they have not suffered any resultant disability resulting from their exposure to toxic substances used in the course of their work."[105] Plaintiffs' other affiants generally agree that plaintiffs could not successfully prosecute a claim for disability under either the old worker's compensation law or the new Labor Code.

Plaintiffs urge the court to conclude that because they would be unable to successfully recover claims for disability compensation under either the old Workmen's Compensation Act or the new Labor Code they will be deprived of all remedies. However, this argument must be viewed in light of the additional information contained in Professor Fernandez's two affidavits. Before the new Labor Code was enacted a person suffering a work related injury through the tortious conduct of a third-party (*i.e.*, not his employer) was faced with an election of remedies. If the worker wished to proceed against his employer for disability, section 5 of the Workmen's Compensation Act[106] made the right of action provided by section 2 of that Act his exclusive initial remedy, and he could only proceed before the Workmen's Compensation Commission. *Robles v. Yap Wing*, 41 SCRA 267, 270–75 (1971) (upholding dismissal from regular courts of a claim for compensable disability damages against only the em-

ployer pursuant to Article 1711 of the Civil Code). Once a worker accepted compensation the employer became subrogated to the worker's right to proceed against any third-party tortfeasors, but the employer remained obligated to turn over to the worker all amounts recovered in excess of the compensation paid. *Esguerra v. Muñoz Palma*, 104 Phil. 582, 586 (1958). However, if the worker's claim for compensation was denied or if, pursuant to section 6 of the Act, he elected to forego any claim for compensation, he could proceed directly against the third-party tortfeasor in the regular courts.[107] Finally, a worker who joined a disability claim with other, non-disability related, claims against the employer could proceed immediately in the regular courts under Article 1711. *Pacana v. Cebu Autobus Co.*, 32 SCRA 442, 448–50 (1970). Professor Fernandez' reply affidavit reveals that, with the exception of the substitution of the State Insurance Fund for the employer's worker's compensation insurance carrier, the situation is remarkably similar under the new Labor Code.[108]

The court is persuaded that the law of the Philippines provides plaintiffs with either a right to seek compensation under the applicable benefits regime or a right of action against any third-party tortfeasor who caused their injuries. The court is not persuaded that plaintiffs would be foreclosed from pursuing a direct action against their

---

compensable under the old Workmen's Compensation Act).

**105.** Fernandez Affidavit, ¶ 17.

**106.** Section 5, entitled "Exclusive right to compensation" provided, in pertinent part, that "The rights and remedies granted by this Act to an employee by reason of a personal injury entitling him to compensation shall exclude all other rights and remedies ... against the employer ... because of said injury."

**107.** *Esguerra v. Muñoz Palma* at 585–86 ("[T]he injured laborer was initially free to choose either to recover from the employer the fixed amounts set by the Compensation Law or else, to prosecute an ordinary civil action against the tortfeasor for higher damages.... Having staked his fortunes on a particular remedy, [the worker] is precluded from pursuing the alternate course, at

least until the prior claim is rejected by the Compensation Commission."). *Accord, Robles v. Yap Wing*, 41 SCRA at 273 ("[S]ection 6 [of the Workmen's Compensation Act] ... gives the injured employee the option to claim compensation benefits against his employer under the Act or to sue the third person who caused the injury for damages in the regular courts.").

**108.** Fernandez' Reply Affidavit, ¶ VIII(3) ("[I]n a situation where a third party's acts has brought about the work-connected or work-related injury, a claim for damages may be pursued against such third-party. However, upon payment of employee compensation by the [State Insurance Fund] System, the latter is subrogated to the claim of the worker, and the System may prosecute the claim for damages against the third party, with any excess of recovery going [to the] worker pursuant to Art. 174 of the Labor Code.").

employers in the event that their injuries are not compensable under either the old Workmen's Compensation Act or the new Labor Code. In *Robles v. Yap Wing* the Supreme Court of the Philippines stated that

> Our Workmen's Compensation Act is patterned after the statutes of Hawaii, New York, and Minnesota. American decisions and authorities are therefore relevant in the interpretation of our local law on the subject, thus:
>
> > "The compensation remedy is exclusive of all other remedies for the same injury, if the injury falls within the coverage formula of the act. If it does not, as in the case where occupational diseases are deemed omitted because not within the concept of accidental injury, the compensation act does not disturb any existing remedy...."

41 SCRA at 273–74. The court therefore concludes that plaintiffs will not be deprived of all remedies in the courts of the Philippines.

### xi. *Saint Lucia*

Defendants submit the affidavits of Winston F. Cenac, President of the Saint Lucia Bar Association and former Attorney General of Saint Lucia, Saint Vincent, and Grenada. Mr. Cenac states that "[p]laintiffs would have a remedy for any claim based on infertility pursuant to the English Common Law and Article 917A of the Civil Code provides a remedy to the end user of manufactured products where the manufacturer is negligent."[109] While plaintiffs' affiant, Leonard Joseph Riviere, former Attorney General and Minister of Legal Affairs of Saint Lucia, states that the Pesticide Control Act of 1975 would not govern plaintiffs' actions, he does not challenge Mr. Cenac's conclusions. Accordingly, the court concludes that plaintiffs will not be treated unfairly or deprived of all remedies in the courts of Saint Lucia.

### xii. *Saint Vincent*

Defendants submit the affidavits of Adrian D. Saunders, former Secretary of the Saint

Vincent Bar Association. Mr. Saunders states that "Saint Vincent subscribes to and faithfully applies the English common law" and concludes that "[p]ursuant to ... tort theories based upon English common law applicable in Saint Vincent an individual Plaintiff in this country may bring an action in the appropriate judicial forum for personal injuries such as those alleged by the Plaintiffs...."[110] While plaintiffs' affiant, Robert Andrew Cummings, counsel to the Saint Vincent Banana Growers Association, states that the Pesticide Control Act, Chapter 42 of the Laws of Saint Vincent, 1990, would not govern plaintiffs' actions, he does not challenge Mr. Saunders' conclusions. Accordingly, the court concludes that plaintiffs will not be treated unfairly or deprived of all remedies in the courts of Saint Vincent.

### c. *Conclusion*

Because defendants have indicated their willingness to condition dismissal upon waiver of all jurisdictional and limitations defenses by all defendants and third-party defendants, and because dismissal will also be conditioned upon acceptance of jurisdiction over these actions by the courts in each country, the court concludes that defendants have met their burden to establish the existence of at least one alternative forum for plaintiffs from each country. A careful review of the materials submitted by the parties convinces the court that each alternative forum is an adequate forum.

### 3. *Private interest factors*

 Once a court has concluded that a "foreign forum is both available and adequate, it should then consider all of the relevant factors of private interest, weighing in the balance the relevant deference given the particular plaintiff's initial choice of forum." *In re Air Crash Disaster Near New Orleans, La.*, 821 F.2d at 1165.

### a. *The relevant deference*

While district courts ordinarily should respect an American plaintiff's forum

---

**109.** Supplemental Cenac Affidavit, ¶ 6.

**110.** Saunders Affidavit, ¶¶ 9, 16.

**1366**

choice, a foreign plaintiff's choice of an American forum merits less deference. . . .

. . . . .

Convenience is the ultimate consideration for a district court in balancing the private interest factors, including the forum choice of the plaintiff. When a plaintiff chooses a foreign forum for its claims, courts are reluctant to assume that convenience motivated that choice.

*Empresa Lineas Maritimas Argentinas, S.A. v. Schichau–Unterweser, A.G.,* 955 F.2d 368, 373 (5th Cir.1992). Although a few plaintiffs now reside in the United States, all are citizens of foreign countries, all claim that their injuries arose from exposure to DBCP in foreign countries, and all invoke the jurisdiction of the courts of Texas pursuant to Tex.Civ.Prac. & Rem.Code Ann. § 71.031. Accordingly, all plaintiffs' forum choices merit only the deference accorded to foreign plaintiffs. Plaintiffs, relying on *Blanco v. Banco Industrial de Venezuela, S.A.,* 997 F.2d 974, 981 (2d Cir.1993) (affording Venezuelan plaintiff's forum choice deference usually reserved for citizens of the United States because a treaty of friendship, commerce, and navigation exists between the two countries), urge the court to afford their forum choice the same deference as that afforded to citizens of the United States. Although plaintiffs do not cite and the court has not found any similar authority in the Fifth Circuit, the court will nevertheless review defendants' motion under the higher standard that requires defendants to overcome the presumption accorded the plaintiffs' chosen forum by proving that the balance of interests points clearly toward trial in the alternative forum. *Piper Aircraft Co. v. Reyno,* 454 U.S. at 253–57, 102 S.Ct. at 265–66.

### b. *Balancing the interests*

In determining whether a particular forum is appropriate, the court is required to balance the private interests of the litigants. . . . The private interests to be considered include: (i) relative ease of access to sources of proof; (ii) availability of compulsory process for attendance of unwilling and the costs of obtaining attendance of willing, witnesses; (iii) possibility of view of premises, if a view would be appropriate to the action; (iv) all other practical problems that make trial of a case easy, expeditious and inexpensive; and (v) enforceability of a judgment if one is obtained.

*Gonzalez v. Naviera Neptuno A.A.,* 832 F.2d 876, 878 (5th Cir.1987). "While reviewing these private interest factors, the court should also consider [vi] whether the defendant's motion to dismiss was filed in a timely manner," *Baumgart v. Fairchild Aircraft Corp.,* 981 F.2d at 836, and "should review the motion in light of the status of the case at the time the motion is filed." *In re Air Crash Disaster Near New Orleans, La.,* 821 F.2d at 1166. When balancing the private interest factors a district court must not give conclusive weight to any one factor. *Empresa Lineas Maritimas v. Schichau–Unterweser, A.G.,* 955 F.2d at 376.

#### i. *Relative ease of access to sources of proof*

Plaintiffs do not allege that defendants' products were defectively manufactured or designed. They allege that the products were defectively marketed because defendants continued manufacturing, selling, distributing, and using DBCP after they knew that it could cause the injuries the plaintiffs ultimately suffered. Toxic tort cases concerning defective marketing are intensely fact specific. The key issues are (1) whether plaintiffs were exposed to a particular defendants' product, (2) whether plaintiffs were actually injured and, if so, whether the product caused the injury, (3) whether defendants violated a duty by failing to provide adequate warnings or by marketing a product so unreasonably dangerous that it should never have been marketed, and (4) whether plaintiffs' own conduct provides a defense to a defendant's liability for their injuries.

As pointed out by defendants' affiant, R. Burton Ballanfant, to properly investigate these matters entails a need to question not only the plaintiffs, but also their co-workers, family members, neighbors, supervisors, doctors, and employers. Defendants may also

need to inspect numerous documents, including plaintiffs' employment records, to construct an accurate picture of each plaintiff's level of exposure to DBCP, and plaintiffs' medical and personnel records to uncover other potential causes of infertility, such as alcoholism, drug abuse, venereal disease, psychological difficulties, and familial or congenital conditions.

With the exception of a few plaintiffs who now reside in the United States, all of these many thousand sources of proof can only be found in the various countries in which plaintiffs are citizens or in which they worked. In recognition of the difficulty defendants would encounter accessing these widely scattered sources of proof from litigation conducted in Houston, plaintiffs offer to alleviate the onerousness of defendants' information gathering burden. Each plaintiff promises to appear in Houston at his own expense and to submit to deposition and examination by defendants' medical or other experts. Each plaintiff also offers to bring at least two co-workers, and all medical staff necessary to prove the extent of his injury or to reimburse defendants' travel expenses to obtain access to this information. Performance of these promises is guaranteed by each plaintiff's additional promise to accept dismissal of his case with prejudice if he fails to perform.

While these stipulations satisfy many of defendants' concerns, they do not provide a realistic alternative to proceedings in plaintiffs' home countries. Plaintiffs' stipulations do not satisfy defendants' need to obtain access to information in the possession of non-parties such as plaintiffs' family members, neighbors, supervisors, and former or current employers. Nor do the stipulations address whether a plaintiff should suffer the penalty of dismissal if, through no fault of his own, he is unable to compel production of information from these sources in Houston.

Plaintiffs argue that the evidence concerning the manufacturing defendants' knowledge of DBCP's dangerous characteristics, their decisions to continue marketing DBCP notwithstanding this knowledge, and documentary proof of distribution will be found only in the United States and that access to that information will be unavailable through the discovery process if these cases are dismissed. Although plaintiffs argue that the world headquarters of two defendants, Shell and Occidental, are located in Houston, and Dallas, Texas, they do not identify any specific group of persons located in Texas who possess either large amounts of information or particularly critical pieces of information who could not be subjected to compulsory appearance in plaintiffs' home countries as employees of a party defendant.

The court concludes that the overwhelming majority of the relevant sources of proof are more readily available to the parties in the home countries of the plaintiffs and that this factor weighs heavily in favor of dismissal. Nevertheless, because foreign fora might not afford plaintiffs as many opportunities for discovery as they desire, to ensure that plaintiffs have access to evidence located in the United States no case will be dismissed until 90 days have elapsed after the entry of this Memorandum and Order. During that time plaintiffs may pursue expedited discovery against defendants under the supervision of this court. The court will also condition dismissal on the stipulation by defendants (and third-party and fourth-party defendants) that all discovery conducted during the pendency of these actions (and in *Rodriguez* and *Erazo* prior to remand) may be used in any foreign proceeding.

ii. *Availability of compulsory process for attendance of unwilling witnesses and the costs of obtaining attendance of willing witnesses*

The overwhelming majority of fact witnesses reside in the home countries of the plaintiffs. With the exception of named plaintiffs, none of these witnesses are subject to the subpoena power of this court. Moreover, since defendants have expressed an interest in impleading at least some of these fact witnesses, including some of plaintiffs' employers and supervisors, the unavailability of compulsory process may result in more than just inconvenience. Although plaintiffs argue that their stipulation should mitigate

the effect of this factor, neither plaintiffs nor defendants could compel unwilling witness to appear in Houston as a result of the stipulation.

Transportation costs to bring willing witnesses from around the world to Houston will be very high. Although this factor is affected somewhat by plaintiffs' stipulation, plaintiffs have not agreed to help defray the costs necessary to secure attendance of defendants' own foreign witnesses. Moreover, the court cannot ignore that the overall economic cost will be greater if plaintiffs and their witnesses travel to Houston than if defendants' representatives and their documents are transported to plaintiffs' home countries. The court concludes that this factor weighs heavily in favor of dismissal.

### iii. *Possibility of view of premises*

Although defendants state in their f.n.c. motion that a view of the banana plantations "likely will be required to investigate [p]laintiffs' allegations with respect to the conditions of exposure to DBCP and application techniques," neither party has produced any evidence that a view of the banana plantations or of any other location or site would be relevant or helpful to the trier of fact. Accordingly, the court finds that this factor should not be afforded any weight in the balancing of interests.

### iv. *Other practical problems that make trial of a case easy, expeditious, and inexpensive*

■ Plaintiffs argue that trial of these actions in this court will be much less costly and will proceed much faster than trials in the plaintiffs' home countries. In particular, plaintiffs argue that no other single forum can handle all of these actions as a unitary whole. Plaintiffs also argue that because class actions are unavailable in many of their home countries and because joinder of large numbers of actions is not customary in these countries, they will be forced to commence thousands of individual actions in hundreds of courts that are understaffed, back-logged, and ill-equipped to handle the sheer number and complexity of these cases in a timely, efficient manner. Plaintiffs also argue that the availability of interlocutory appeals and other procedural differences between case management techniques practiced in this court and those practiced in the courts of their home countries will result in avoidable, unnecessary delay in resolving their cases. Finally, plaintiffs argue that because contingent fee arrangements to cover attorney's fees are either illegal or unethical in many of these countries and because bonds covering court costs are often required, plaintiffs' initial expenses will be much greater in their home countries than in this court.

Defendants respond that while plaintiffs have sought class certification in several of the pending actions, no classes have been certified. Defendants also note that even if classes are certified, these cases will take years to try because each plaintiff will still have to present individual proof of exposure, injury, and causation. The court agrees. There are more than 16,000 individual plaintiffs in these consolidated actions. More than 14,000 of these plaintiffs will remain after *Rodriguez* (approximately 1500 plaintiffs) and *Erazo* (a single plaintiff) are remanded to state court. Even assuming that the undersigned judge were allowed to cede responsibility for the remainder of his docket and to devote undivided attention to trial of this action, it would take more than a decade to hear the causation and damage issues alone.[111]

As to the relative expense, the court must consider that because much of the testimony and many of the documents in these actions will be presented to the court in the languages of the plaintiffs' home countries, a variety of interpreters will be required. As to the availability of contingent fee arrangements and bonding requirements, the court observes that most of plaintiffs' home countries employ fee shifting devices under which

---

**111.** For example, even with efficient case management techniques and simultaneous translation of testimony of foreign witnesses it is doubtful that the court could hear the evidence concerning more than two plaintiffs per day, or 500 plaintiffs per year, assuming 250 trial days per year.

the losing party is responsible to reimburse the winner for all of the court costs and attorney's fees paid. In most of the countries an indigent plaintiff can also obtain free counsel.

The parties have identified a variety of countervailing considerations as to which forum would be more efficient and less expensive. Because continued proceedings in this forum would yield the added efficiency of consolidating all further pretrial motions before one judge who is already familiar with the issues in the case, the court concludes that, on balance, this factor weighs slightly against dismissal.

### v. *Will a foreign judgment be enforceable?*

■ Defendants have expressed willingness to condition dismissal of these actions on an agreement to establish a mechanism guaranteeing satisfaction of any judgment in the home countries of plaintiffs. Such an agreement would result in no effective difference between a judgment rendered in a foreign court and one rendered in the United States. Since such an agreement would place this factor in equipoise it will be afforded no weight in the balancing of interests.

### vi. *Was defendant's motion to dismiss filed in a timely manner?*

■ Plaintiffs argue that defendants' f.n.c. motion was not filed in a timely manner because these cases were pending in state court for a lengthy period before removal and were pending in federal courts for a lengthy period before defendants filed their motions to dismiss. Ordinarily, "untimeliness ... should weigh heavily against the granting of the motion [to dismiss for f.n.c.] because a defendant's dilatoriness promotes and allows the very incurrence of costs and inconveniences the doctrine is meant to relieve." *In re Air Crash Disaster Near New Orleans, La.,* 821 F.2d at 1165. This is not the ordinary case, however.

Because plaintiffs filed these actions in Texas courts before September 1, 1993, the Texas Supreme Court's decision in *Dow Chemical Co. v. Alfaro,* 786 S.W.2d at 679, precluded defendants from obtaining an f.n.c. dismissal as long as the actions remained in state court. Moreover, shortly after the actions were removed to federal court plaintiffs sought [112] and obtained an order [113] delaying consideration of any motion to dismiss for f.n.c. until after plaintiffs' motions to remand and to dismiss for lack of subject matter jurisdiction had been resolved. The court then circulated [114] and established a schedule for addressing dispositive motions, including motions to dismiss for f.n.c.[115] Since this Memorandum and Order simultaneously considers the merits of plaintiffs' motions to remand and to dismiss for lack of subject matter jurisdiction and defendants' motions to dismiss for f.n.c., the court is convinced that any delay between commencement of the actions and consideration of the motions to dismiss was not attributable to dilatoriness by defendants. Because defendants were not dilatory, and because little discovery into the merits of plaintiffs' actions has taken place, the court concludes that delay should not be afforded appreciable weight in the balancing of interests.

#### c. *Conclusion*

■ When viewed as a whole the private interests weigh strongly in favor of dismissing these actions under the doctrine of *forum non conveniens.* Defendants have persuaded the court that the overwhelming majority of the evidence can only be made readily available in plaintiffs' home countries. Although plaintiffs have demonstrated a need to discover evidence in the United States, the court is persuaded that plaintiffs will have adequate access to such evidence if dismissal is postponed for 90 days. Defendants have also satisfied the court that, on balance, their concern about access to the sources of proof outweighs the modest efficiency to be gained from continued litigation in this court. Defendants have therefore overcome the presumption favoring plaintiffs' forum choice by demonstrating that the balance of interests clearly point in favor of prosecuting these actions in plaintiffs' home countries.

---

112. Docket Entry No. 33 in H–94–1337.

113. Docket Entry No. 54 in H–94–1337.

114. Docket Entry No. 188 in H–94–1337.

115. Transcript of Hearing Proceedings, Docket Entry No. 261 in H–94–1337, at 21–27.

#### 4. Public interest factors

■ If a district court concludes that an adequate alternative forum is available and that the balance of private interest factors strongly favors dismissal, it "ha[s] no need to consider the public interest factors." *Empresa Lineas Maritimas v. Schichau-Unterweser, A.G.*, 955 F.2d at 376. Nevertheless, for the sake of completeness (having already surrendered any hope of achieving brevity),[116] the court will also examine the public interest factors.

#### a. Balancing the interests

In *Piper Aircraft Co. v. Reyno*, the Supreme Court synthesized the most relevant public interest factors enumerated in *Gulf Oil Corp. v. Gilbert*.

> The public factors bearing on the question included the administrative difficulties flowing from court congestion; the "local interest in having localized controversies decided at home"; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty.

454 U.S. at 241 n. 6, 102 S.Ct. at 258 n. 6.

#### i. Localized controversies

■ This controversy involves thousands of plaintiffs who allege injuries resulting from exposure in 23 foreign countries to DBCP that was manufactured in several states of the United States and in Israel. The controversy is not "localized" in the Southern District of Texas (or in any other location in Texas) under any meaning of the word "local." Aside from the fact that many years after plaintiffs' exposure to DBCP ended two plaintiffs in *Valdez* moved to Texas[117] and that two defendants moved their headquarters to Texas, plaintiffs have produced no evidence that any defendant took any action in Texas that affected whether plaintiffs would be exposed to DBCP. The dearth of evidence linking plaintiffs' claims to Texas weighs heavily in favor of dismissal. *See Syndicate 420 at Lloyd's London v. Early American Ins. Co.*, 796 F.2d at 831–32 (affirming dismissal for f.n.c.).

#### ii. Interest in having diversity cases tried by a court that is "at home" with the law that must govern the action

■ The parties devote considerable briefing to whether the local law of each country will apply to plaintiffs' actions, or whether they will be governed by "American law," the law of a state of the United States, or even, as plaintiffs' most recent papers suggest, whether different laws will govern different aspects of plaintiffs' claims. The court need not decide what law will apply because the court is convinced that the two bodies of law with which this court is "at home," Texas law and federal law, will not apply.[118] However, because both federal law

---

116. The court has allowed the parties extraordinary leeway in submitting numerous briefs and other written materials in connection with the pending motions. As the length of this Memorandum and Order indicates, the court has expended considerable time reading these papers and performing a significant amount of independent research to be as fully informed as possible when addressing the parties' arguments. While, because of the sheer volume of information presented, it is not impossible that some arguments were overlooked, the parties should assume that failure to expressly address a particular argument in this Memorandum and Order reflects the court's judgment that the argument lacked sufficient merit to warrant discussion. Accordingly, the court strongly discourages the parties from seeking reconsideration based on arguments they have previously raised or that they could have raised.

117. In light of the court's remand order in *Rodriguez*, the Texas resident in that case will have access to a Texas court.

118. Of the many potential bodies of substantive law that might apply to these cases, Texas is the least likely to govern resolution of any aspect of plaintiffs' cases. Not a single plaintiff alleges that he was injured by exposure to DBCP in Texas. Not a single plaintiff alleges that the

and Texas law share a common-law tradition with most of the other states of the United States, and because many of plaintiffs' home countries share a civil law tradition, the court is perhaps slightly better acquainted with the other domestic laws that might govern some aspect of plaintiffs' actions than are the courts of the plaintiffs' home countries. Accordingly, because the choice of law questions raised by the parties are not yet resolved, the court attributes little weight to this factor.

### iii. The avoidance of unnecessary problems in conflict of laws or in the application of foreign law

As intimated in the preceding section, these cases present multiple and complex questions about which law to apply to different aspects of plaintiffs' claims. If the choice of law analysis ultimately points to application of the laws of plaintiffs' home countries to plaintiffs' claims, a trial in this court would require a jury to consider at least twelve different legal standards and to quantify damages according to at least twelve different measures. As complicated as that scenario may be, it pales in comparison to the possibility that a jury may be asked to apply the laws of several states of the United States with respect to the conduct of some defendants in some countries for some of the relevant time frame and to apply the laws of some of plaintiffs' home countries to other conduct of other defendants for other relevant periods. Although proceedings in each of plaintiffs' home countries cannot entirely avoid the question of which law to apply to each defendant, the menu of potential choices available to a court in any of plaintiffs' home countries will invariably be much shorter due to the elimination of foreign laws based on the nationalities of plaintiffs from other foreign countries and of defendants who are not implicated in plaintiffs' home countries. (Not all defendants are implicated in all of plain-

tiffs' home countries.) Accordingly, this factor weighs in favor of dismissal.

### iv. The unfairness of burdening citizens in an unrelated forum with jury duty

■ Plaintiffs have repeatedly reminded the court that a judge, as opposed to a jury of lay persons, would decide contested issues of fact if these cases were tried in most of their home countries. If the cases remain in Texas plaintiffs seek jury trials. When citizens of the United States serve as jurors they are compelled to forsake their chosen occupations for the duration of the trial. Given the projected duration of a trial of these actions, this court would be forced to conscript a sufficient number of local residents to literally undertake careers as jurors. In light of the tenuous connection between the Southern District of Texas and the subject matter of these lawsuits, the court concludes that this factor weighs heavily in favor of dismissal.[119]

### b. Conclusion

■ Defendants have demonstrated that there is no significant connection between the substance of plaintiffs' complaints and this forum. The lack of a substantial connection to this forum persuades the court that continued proceedings here would not result in application of a body of substantive law with which this court is familiar. Moreover, if these actions were heard in the courts of plaintiffs' home countries, each action would raise substantially fewer and far less complex questions implicating the choice of laws. Finally, the court concludes that the length and complexity of plaintiffs' actions, when coupled with the lack of a substantial connection to this forum, would result in an unfair burden upon local residents forced to serve as jurors.

DBCP that injured him was manufactured in, sold in, distributed from, or in any other relevant respect associated with the state of Texas.

**119.** Although the docket of this court is crowded, so are the dockets of most courts. The court will therefore afford this factor little weight in balancing the public interests.

## V. *Conclusion and Order*

### A. Issues Concerning the Propriety of Removal

#### 1. *FSIA jurisdiction*

Because Dead Sea was a foreign sovereign when plaintiffs were allegedly exposed to its DBCP and because there is no evidence that defendants collusively joined Dead Sea, the court concludes that 28 U.S.C. § 1359 is not an impediment to jurisdiction in any of the consolidated cases. Because Dead Sea has waived its foreign sovereign immunity and has consented to the jurisdiction of this court, its presence confers federal subject matter jurisdiction over the entire controversy.

#### 2. *Defects in removal procedure*

Because Dead Sea removed *Jorge Carcamo*, *Rodriguez*, *Erazo*, and *Valdez* before the state courts granted defendants leave to implead Dead Sea as a third-party defendant, removal of these four cases was defective. Because Shell's supplemental removal notices were filed more than 30 days after it received the first paper from which the existence of any arguably removable federal question could have been ascertained, those attempted removals were untimely.

#### 3. *Remand and retention*

In *M & O I* the court concluded that Dead Sea's removal of *Delgado* was properly achieved but reserved the right to reexamine the existence of subject matter jurisdiction. Because Dead Sea was properly impleaded in *Delgado* and because subject matter jurisdiction over that case exists, the court will not remand it. Similarly, because Dead Sea was properly impleaded in *Isae Carcamo*, the court finds no reason to disturb Judge Radford's decision not to remand that case.[120]

Because Dead Sea was impleaded in *Jorge Carcamo* and *Valdez* after removal pursuant to leave of federal court granted under Fed. R.Civ.P. 14(a), Dead Sea now possesses a mature right to remove those actions. Accordingly, the court concludes that remand of these cases would be a futile gesture and would merely result in unnecessary expense and delay to the parties. The court therefore finds no reason to disturb Judge Radford's decision not to remand *Valdez*.[121] For similar reasons, plaintiffs' Emergency Motion to Remand *Jorge Carcamo*[122] is **DENIED**. However, because the removals of *Rodriguez* and *Erazo* were procedurally defective, plaintiffs' Motion to Remand[123] in those two cases is **GRANTED**. Accordingly, pursuant to 28 U.S.C. § 1447(c), *Rodriguez* is **REMANDED** to the 229th District Court of Jim Hogg County, Texas, and *Erazo* is **REMANDED** to the 206th District Court of Hidalgo County, Texas. The clerk is **ORDERED** to mail a copy of this Memorandum and Order to the District Clerks of Jim Hogg and Hidalgo Counties.

### B. Issues Concerning Dismissal of Parties and Actions

#### 1. *Forum non conveniens*

##### a. *Dismissal*

The court concludes that defendants did not waive the right to assert (and are not estopped from asserting) their motions to dismiss for f.n.c. Although an adequate alternative forum exists in each country, the court concludes that these fora will only be available if defendants agree to waive all jurisdictional and certain limitations-based defenses and if the courts in those countries do not refuse to exercise jurisdiction over these actions. The court also concludes that the balance of the relevant private and public interests points clearly toward trial in the plaintiffs' home countries if plaintiffs are allowed a reasonable period within which to conduct merits discovery of defendants and others within the United States and if defendants agree to satisfy plaintiffs' concerns re-

---

**120.** Docket Entry No. 137 in H–95–1356.

**121.** *Id.*

**122.** Docket Entry No. 8 in H–94–1359.

**123.** Docket Entry Nos. 6 in H–94–3248 & 9 in H–94–3451.

garding the enforceability of judgments rendered in their home countries. Accordingly, defendants' motion to dismiss these consolidated actions (other than *Rodriguez* and *Erazo*) on the grounds of *forum non conveniens* [124] is conditionally **GRANTED**.

*Delgado, Jorge Carcamo, Valdez,* and *Isae Carcamo* will be dismissed 90 days after the entry of this Memorandum and Order provided that defendants and third- and fourth-party defendants have:

(1) participated in expedited discovery in the United States according to the following schedule. By July 21, 1995, counsel for plaintiffs (and intervenor-plaintiffs) will provide counsel for defendants (including counsel for third- and fourth-party defendants) with any additional papers seeking production of written discovery and a list of all witnesses they seek to depose during this 90–day period together with the approximate length of each deposition. By July 31, 1995, counsel for defendants and third- and fourth-party defendants will provide counsel for plaintiffs with any objections to plaintiffs' additional discovery. Counsel will meet during the week of July 31, 1995, to resolve any objections and to agree on a schedule for depositions and production of documents. By August 7, 1995, counsel will furnish the court with their agreed schedule and a short discussion of any unresolved discovery issues together with a synopsis of the parties' arguments;

(2) either waived or accepted service of process and waived any other jurisdictional defense within 40 days after the entry of this Memorandum and Order in any action commenced by a plaintiff in these actions in his home country or the country in which his injury occurred. Any plaintiff desiring to bring such an action will do so within 30 days after the entry of this Memorandum and Order;

(3) waived within 40 days after the entry of this Memorandum and Order any lim-

itations-based defense that has matured since the commencement of these actions in the courts of Texas;

(4) stipulated within 40 days after the entry of this Memorandum and Order that any discovery conducted during the pendency of these actions may be used in any foreign proceeding to the same extent as if it had been conducted in proceedings initiated there; and

(5) submitted within 40 days after the entry of this Memorandum and Order an agreement binding them to satisfy any final judgment rendered in favor of plaintiffs by a foreign court.

Any objections of plaintiffs concerning the waivers, stipulations, and agreements of defendants pursuant to subparagraphs (2), (3), (4), or (5) will be filed within 50 days after the entry of this Memorandum and Order. Any reply to such objections will be filed within 60 days after the entry of this Memorandum and Order.

### b. *Injunctive relief*

In addition to dismissal, defendants urge the court to make permanent the preliminary injunction barring the plaintiffs and intervenor-plaintiffs from commencing any new case arising from the same facts as those presented in these cases. On June 19, 1995, the court entered an order preliminarily enjoining plaintiffs and intervenor-plaintiffs from commencing any new DBCP-related actions because the filing of additional actions would undermine the court's ability to fashion effective relief in the event defendants' motion to dismiss was successful. At that time defendants proffered evidence that "[d]efendants, either individually or collectively, face[d] an imminent threat of the commencement of new DBCP-related actions in a court other than this Court." [125] Defendants argue that this is still the case and that a permanent injunction is necessary to ensure that plaintiffs do not harass them by instituting numerous actions and forcing repetitive litiga-

---

**124.** Docket Entry No. 244 in H–94–1337.

**125.** Docket Entry No. 280 in H–94–1337, at ¶ 2.

tion as to the inconvenience of various United States fora.

 In general f.n.c. dismissals are without prejudice, but "nothing about a *forum non conveniens* dismissal requires a dismissal without prejudice." [126] Similarly, the ordinary f.n.c. dismissal is not accorded full *res judicata* effect. Thus,

> [a] forum non conveniens dismissal in one forum does not necessarily preclude the maintenance of an identical suit in another forum.... [However,] "the plaintiff in the new forum must do more than ask for a rebalancing of forum non conveniens considerations. He must show objective facts relevant to the issue that materially alter the considerations underlying the previous resolution."

*Villar v. Crowley Maritime Corp.*, 780 F.Supp. 1467, 1482 (S.D.Tex.1992), *aff'd*, 990 F.2d 1489 (5th Cir.1993), *cert. denied*, ―― U.S. ――, 114 S.Ct. 690, 126 L.Ed.2d 658 (1994) (approvingly quoting *Exxon Corp. v. Chick Kam Choo*, 817 F.2d 307 (5th Cir. 1987), *rev'd*, 486 U.S. 140, 108 S.Ct. 1684, 100 L.Ed.2d 127 (1988)).

 This court possesses authority pursuant to the All Writs Act, 28 U.S.C. § 1651(a), and its inherent powers, to enjoin the commencement of litigation in appropriate circumstances. The Anti–Injunction Act, 28 U.S.C. § 2283, does not disturb this power to the extent that the injunction bars further proceedings in federal court nor does it disturb the power to enjoin state court actions before such actions are commenced.[127]

Plaintiffs argue that unlike other cases in which such injunctions have issued, this is not an appropriate case for injunctive relief because none of the current plaintiffs have filed repetitive actions in the past. If these actions are ultimately dismissed the record is unclear whether plaintiffs or intervenor-plaintiffs intend to refile their claims in other courts within the United States. Accordingly, plaintiffs may, within 40 days after the entry of this Memorandum and Order, supplement the record by introducing evidence concerning their intentions and any argument addressing defendants' concerns about vexatious, repetitive litigation. Defendants will file any response within 10 days after receipt of plaintiffs' papers and plaintiffs may reply within 10 days after receipt of any response.

Because dismissal of these cases has not yet been accomplished, the court must examine the need for continued interim relief. The court concludes that it is still true that "[t]he filing of any new DBCP-related actions in the United States by plaintiffs and intervenor-plaintiffs in the present actions would substantially undermine this court's authority and ability to effectively rule on defendants' motion to dismiss for forum non conveniens and their motion for permanent injunctive relief and to grant meaningful relief if the court grants the motion." [128] Continuation of the preliminary injunction is also necessary to preserve the status quo and to preserve the court's jurisdiction and authority until the parties have taken the actions necessary

---

126. *Quintero v. Klaveness Ship Lines*, 914 F.2d 717, 722 (5th Cir.1990), *cert. denied sub nom. Quintero v. Torvald Klaveness & Co., A/S*, 499 U.S. 925, 111 S.Ct. 1322, 113 L.Ed.2d 255 (1991) (This statement is *dicta*, however, because the district court's dismissal followed a decision on the merits: "Our court has noted that addressing the choice of law and applicability of law in maritime cases is a determination on the merits and, thus, [a motion seeking such determination including a motion to dismiss for f.n.c.] may be treated as a motion for summary judgment. Given that the district court determined, after discovery, that Philippine law governed this controversy, we conclude that the district court did reach the merits.").

127. *Vendo Co. v. Lektro–Vend Corp.*, 433 U.S. 623, 639 n. 6, 97 S.Ct. 2881, 2889–90 n. 6, 53 L.Ed.2d 1009 (1977) (plurality opinion) ("[W]hat we must here decide is whether such a lawsuit may be enjoined by a federal court *after* it has been commenced, notwithstanding the bar of the Anti–Injunction Act. While we conclude that it may not, nothing in our opinion today prevents a *federal* court in the proper exercise of *its* jurisdiction from enjoining the commencement of additional state-court proceedings if it concludes from the course and outcome of the first one that such proceedings would constitute a violation of the antitrust laws.").

128. Docket Entry No. 280 in H–94–1337, at ¶ 3.

to give effect to the terms of this Memorandum and Order.

Absent continued preliminary injunctive relief, the individuals whom defendants seek to permanently enjoin may take the precise actions this court is being asked to enjoin. Moreover, defendants have successfully opposed remand in the actions still pending in this court and have demonstrated a substantial likelihood that they will succeed on the motions to dismiss for f.n.c. and their motions for permanent injunctive relief. Finally, it is still true that (1) defendants and the court system of the United States would suffer irreparable harm for which there is no adequate remedy at law from the refiling of DBCP-related lawsuits in this country, (2) the threatened injury to defendants and the legal system outweighs any prejudice to plaintiffs, intervenor-plaintiffs, and their counsel, (3) a preliminary injunction will serve the public interest, and (4) no security pursuant to Fed.R.Civ.P. 65(c) is necessary because the primary purpose of this Memorandum and Order is to preserve the court's ability to effectively rule on matters presently before it, to order meaningful relief with respect to motions pending before it, and to prevent abuse of the judicial system.

Accordingly, the court concludes that the preliminary injunction previously issued shall remain in effect pending further order of this court. For the same reasons the court also **AMENDS** its previous order and **PRELIMINARILY ENJOINS** plaintiffs and intervenor-plaintiffs in *Delgado, Jorge Carcamo, Valdez,* and *Isae Carcamo,* and anyone acting in active concert or participation with any of the foregoing persons who receive actual notice of this Memorandum and Order by personal service or otherwise, including, but not limited to, the attorneys who have appeared in these consolidated actions and their law firms, as well as the officers, agents, servants, employees of any of the foregoing persons, from intervening in *Rodriguez* or *Erazo* or any other pending action in the United States involving DBCP-related claims.

### c. *Return*

Notwithstanding the dismissals that may result from this Memorandum and Order, in the event that the highest court of any foreign country finally affirms the dismissal for lack of jurisdiction of any action commenced by a plaintiff in these actions in his home country or the country in which he was injured, that plaintiff may return to this court and, upon proper motion, the court will resume jurisdiction over the action as if the case had never been dismissed for f.n.c.

### 2. *Other motions*

In addition to defendants' motion to dismiss for f.n.c. a number of other motions are pending. Because *Delgado, Jorge Carcamo, Valdez,* and *Isae Carcamo* may be dismissed in 90 days, all pending motions in those cases not otherwise expressly addressed in this Memorandum and Order are **DENIED** as **MOOT.** Because *Rodriguez* and *Erazo* have been remanded, the court will refrain from addressing any further issues raised by pending motions in those cases.